Terri Lee HALDERMAN, a retarded citizen, by her mother and guardian, Winifred Halderman; Larry Taylor, a retarded citizen, by his parents and guardians, Elmer and Doris Taylor; Kenny Taylor, a minor, a retarded citizen, by his parents and guardians, Elmer and Doris Taylor; Robert Sobetsky, a minor, a retarded citizen, by his parents and guardians, Frank and Angela Sobetsky; Theresa Sobetsky, a retarded citizen, by her parents and guardians, Frank and Angela Sobetsky; Nancy Beth Bowman, a retarded citizen, by her parents and guardians, Mr. and Ms. Horace Bowman; Linda Taub, a retarded citizen, by her parents and guardians, Mr. and Mrs. Allen Taub; George Sorotos, a minor, a retarded citizen by his foster parents, William and Marion Caranfa, all of the above individually and on behalf of all others similarly situated; the Parents and Family Association of Pennhurst

Pennsylvania Association for Retarded Citizens, Jo Suzanne Moskowitz, a minor, by her parents and next friends, Leonard and Nancy Moskowitz, Robert Hight, a minor, by his parents and next friends, John and Jeanne Hight, David Preusch, a minor by his parents and next friends, Calvin and Elizabeth Preusch, and Charles DiNolfi, on behalf of themselves and all others similarly situated, Plaintiffs-Intervenors

United States of America,
Plaintiff-Intervenor

v.

PENNHURST STATE SCHOOL & HOSPITAL, Department of Public Welfare of the Commonwealth of Pennsylvania, Frank S. Beal, Secretary of the Department of Public Welfare, Stanley Meyers, Deputy Secretary for Mental Retardation, Department of Public Welfare, Helene Wohlgemuth, Former Secretary, Department of Public Welfare, Aldo Colautti, Executive Deputy Secretary, Department of Public Welfare, Wilbur Hobbs, Deputy Secretary for Southeastern Region, Department of Public Welfare, Russell Rice, Jr., Commissioner of Mental Retardation for Southeastern Region, Department of Public Welfare, C. Duane Youngberg, Superintendent, Pennhurst State School & Hospital, Robert Smilovitz, Former Assistant Superintendent, Pennhurst State School & Hospital, Joseph Foster, Assistant Superintendent, Pennhurst State School & Hospital, Margaret Green, Betty Uphold, Alice Barton, P. E. Klick, Dr. Parocca, Helen Francis, employees and agent of Pennhurst State School & Hospital, John Doctor, James Nurse, Jane Aide, Jill Therapist, Richard Roe, Jane Doe, unknown and unnamed staff, employees and agents of Pennhurst State School & Hospital, each individual Defendant sued individually and in his or her official capacity, George Metzger, Joseph Catania, and Roger Bowers, Commissioners for Bucks County, Robert Strebl, Earl Baker, and Leo McDermott, Commissioners for Chester County, Faith R. Whittlesey, Charles Keeler and William Spingler, Commissioners for Delaware County, A. Russell Parkhouse, Frank W. Jenkins and Lawrence H. Curry, Commissioners for Montgomery County, Mayor Frank L. Rizzo and the City Council of Philadelphia, as Authorities for Philadelphia County, Peter Bodenheimber, Mental Health/Mental Retardation Administrator for Bucks County, William A. McKendry, Mental Health/Mental Retardation Administrator for Chester County, P. Paul Burrichter, Mental Health/Mental Retardation Administrator for Delaware County, Hermann A. Roether, Mental Health/Mental Retardation Administrator for Montgomery County, and Leon Soffer, Mental Health/Mental Retardation Administrator for Philadelphia County, Commonwealth of Pennsylvania, Defendants Pennhurst State School & Hospital, Department of Public Welfare of the Commonwealth of Pennsylvania, Frank S. Beal, Stanley Meyers, Helene Wohlgemuth, Aldo Colautti, Wilbur Hobbs, Russell Rice, Jr., C. Duane

Youngberg, Robert Smilovitz, Joseph Foster, Margaret Green, Betty Uphold, Alice Barton, P. E. Klick, Dr. Parocca, and Helen Francis, Appellants in No. 78-1490

George Metzger, Joseph Catania, and Roger Bowers, Commissioners for Bucks County, and Peter Bodenheimber, Mental Health/Mental Retardation Administrator for Bucks County, Robert G. Strebl, Earl M. Baker, and Leo McDermott, Commissioners for Chester County, and William A. McKendry, Mental Health/Mental Retardation Administrator for Chester County, Faith Ryan Whittlesey, Charles C. Keller, and William A. Spingler, Commissioners for Delaware County, and P. Paul Burrichter, Mental Health/Mental Retardation Administrator for Delaware County, and A. Russell Parkhouse, Frank W. Jenkins, and Lawrence H. Curry, Commissioners for Montgomery County, and Hermann A. Roether, Mental Health/Mental Retardation Administrator for Montgomery County, Appellants in No. 78-1564

Mayor Frank L. Rizzo, the City Council of Philadelphia, and Leon Soffer, Appellants in No. 78-1602.

Nos. 78-1490, 78-1564 and 78-1602.

United States Court of Appeals, Third Circuit.

Argued January 9, 1979.

Reargued en banc Sept. 6, 1979.

Decided Dec. 13, 1979.

As Amended Dec. 19, 1979.

Norman J. Watkins (argued), Deputy Atty. Gen., Dept. of Justice, Chief, Civil Litigation, Harrisburg, Pa., for Commonwealth, appellants in No. 78–1490.

David Ferleger (argued), Philadelphia, Pa., for appellees, Terri Lee Halderman, et al.

Robert B. Hoffman, Deputy Atty. Gen., Gerald Gornish, Acting Atty. Gen., Pa. Dept. of Justice, Harrisburg, Pa., for Commonwealth appellants.

Thomas M. Kittredge (argued), Morgan, Lewis & Bockius, Philadelphia, Pa., for the Suburban County, appellants in No. 78–1564.

Robert N. DeLuca, U. S. Atty., Philadelphia, Pa., Drew S. Days, III (argued), Asst. Atty. Gen., Brian K. Landsberg, Frank D. Allen, Jr., Arthur E. Peabody, Jr., Attys., Dept. of Justice, Washington, D. C., for United States; Jaime Fernandez, Atty., Dept. of Health, Ed. and Welfare, Washington, D. C., of counsel.

Sheldon L. Albert, City Sol., Theodore H. Lunine, Deputy City Sol., Joseph M. Davidson, Asst. City Sol., Marc H. Myers (argued), Asst. City Sol., Philadelphia, Pa., for City of Philadelphia, appellants in No. 78–1602.

Stephen A. Sheller (argued), Bruce M. Ludwig, Philadelphia, Pa., for The Pennhurst Parents-Staff Ass'n, et al., amicus curiae.

Thomas K. Gilhool (argued), Frank J. Laski, Edward A. Stutman, Public Interest Law Center of Philadelphia, Philadelphia, Pa., for appellees Pennsylvania Ass'n for Retarded Citizens, et al.; Michael Churchill, James J. Raggio, Philadelphia, Pa., of counsel.

James D. Crawford (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for amici curiae, Nat. Ass'n for Retarded Citizens, United Cerebral Palsy Ass'n, Inc. and Epilepsy Foundation of America.

Richard Kirschner, Robert C. Cohen, Markowitz & Kirschner, Philadelphia, Pa., for amicus curiae.

Argued Jan. 9, 1979.

Before SEITZ, Chief Judge, and GIBBONS and HIGGINBOTHAM, Circuit Judges.

Reargued en banc Sept. 6, 1979.

Before SEITZ, Chief Judge, and ALDISERT, GIBBONS, ROSENN, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

This is an appeal from an order granting class action injunctive relief against the continued maintenance of Pennhurst State School and Hospital (Pennhurst), a facility for the care and training of persons suffering mental retardation. Located in Spring City, Pennsylvania, Pennhurst is operated under the direction of the Pennsylvania Department of Public Welfare. The appellants are Pennhurst, its superintendent and various other officials of the Commonwealth of Pennsylvania responsible for the operation of Pennhurst (the Commonwealth defendants), and five counties in southeastern Pennsylvania from which mentally retarded persons are admitted to Pennhurst (the County defendants).[1] The appellees are the original and intervening plaintiffs, described more fully below. We affirm the trial court's finding of liability, and modify in part the court's decree.

## I. PROCEEDINGS BELOW

The action commenced on May 30, 1974, when Terri Lee Halderman, a minor retarded resident of Pennhurst, for herself and all other Pennhurst residents, filed a complaint against the Commonwealth defendants. The complaint alleged that the residents, all of whom are mentally retarded, live in inhumane and dangerous conditions, are subjected to unnecessary physical restraints, are given unnecessary and dangerous medication, are consigned to lives of idleness

---

1. The Commonwealth defendants are appellants in No. 78–1490. Appellants in No. 78–1564 include Bucks, Chester, Delaware, and Montgomery Counties. Philadelphia is appel-

lant in No. 78–1602. In a related case, No. 78–1999, disposed of separately, Pennhurst Parents-Staff Association appeals from the denial of its motion to intervene.

because of lack of habilitative programs, and are subjected to numerous physical injuries resulting from a lack of adequate supervision. The complaint further charged that the regimen of Pennhurst caused Halderman and her class to deteriorate and regress emotionally, intellectually, and physically. The conditions to which residents were subjected, she claimed, denied the class members due process and equal protection of the law, and inflicted on them cruel and unusual punishment. Halderman sought both injunctive relief against the conditions at Pennhurst and money damages for past injuries.

In November 1974, the United States moved pursuant to Rule 24, Fed.R.Civ.P. 24, to intervene as a plaintiff. Its complaint sought injunctive relief against the Commonwealth defendants, citing the same conditions about which Halderman had complained. The Commonwealth defendants opposed intervention by the United States, but it was granted on January 17, 1975.[2]

On June 3, 1975, the Pennsylvania Association for Retarded Citizens (PARC) and several additional mentally retarded residents of Pennhurst moved to intervene. Like the United States, PARC and the additional individual plaintiffs sought only injunctive relief and proceeded only against the Commonwealth defendants.

Thereafter PARC and Halderman amended their complaints to seek relief, not only against the Commonwealth defendants, but also against the County defendants, who it was alleged, were responsible for the commitment of the mentally retarded to Pennhurst and also for the lack of local community facilities, access to which the class members were entitled. In the amended complaint the PARC and Halderman plaintiffs alleged violations of various rights arising under the eighth and fourteenth amendments of the United States Constitution; under section 504 of the Rehabilita-

tion Act of 1973, 29 U.S.C. § 794 (1976); under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001–6081 (1976); under the Pennsylvania Mental Health and Mental Retardation Act of 1966, Pa.Stat.Ann. tit. 50, §§ 4101–4704 (Purdon 1969). The district court, on November 29, 1976, denied motions to dismiss filed by the various defendants, and entered an order determining that the action should be maintained as a class action, the class consisting of "all persons who as of May 30, 1974, and at any time subsequent, have been or may become residents of Pennhurst. . . ." This included, besides current residents of the institution, all mentally retarded residents of the five counties of southeastern Pennsylvania who might in the future be placed in Pennhurst.

After extensive pretrial discovery, trial of the action commenced on April 18, 1977, and continued until June 13, 1977. On December 23, 1977, the trial judge made findings of fact and conclusions of law holding that the defendants were violating the rights of members of the mentally retarded class secured to them by section 504 of the Rehabilitation Act of 1973, by the Pennsylvania Mental Health and Mental Retardation Act of 1966, Pa.Stat.Ann. tit. 50, §§ 4101–4704 (Purdon 1969), by the due process and equal protection clauses of the fourteenth amendment, and by the eighth amendment prohibition against cruel and unusual punishment.[3] The court held that the mentally retarded have a federal statutory right to nondiscriminatory habilitation, a Pennsylvania statutory right to minimally adequate habilitation, and federal constitutional rights to nondiscriminatory habilitation, freedom from harm, and adequate treatment by the least restrictive means. Each of these rights was found to have been violated by the conditions of confinement at Pennhurst. Thereafter, on January 6, 1978, the court held a separate hear-

---

**2.** The Commonwealth defendants thereafter sought a writ of mandamus from this court to compel the district court to dismiss the United States as a party. The writ was denied, and petitions for certiorari and for a stay of this court's order were denied by the Supreme

Court. *Beal v. Broderick*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

**3.** The district court's opinion is reported at 446 F.Supp. 1295.

ing on relief. The court requested that the parties meet and attempt to agree upon an order satisfactory to all the litigants. After meeting, the parties informed the court that they could not, and would not be able to, agree on an order. The court then asked the parties to submit separate proposed orders.

On March 17, 1978, the court issued the order from which these appeals were taken.[4] The court ordered that Pennhurst eventually be closed and suitable community living arrangements and necessary support services provided for all Pennhurst residents (approximately 1200); that individualized program plans be developed for each resident with the participation of each class member or his next friend at the formulation and implementation stages; and that plans for the removal of Pennhurst residents to appropriate community based mental retardation programs, meeting individual needs and structured in the least restrictive, most integrated setting, be developed and submitted to the court. The order also provided for the appointment of a Special Master to supervise the planning and implementation of arrangements for placing Pennhurst residents elsewhere, and for the operation of Pennhurst until such placements were accomplished. It enjoined the County defendants from recommending future commitments of mentally retarded persons to Pennhurst, and forbade the Commonwealth defendants from placing additional persons there. It also established a "friend-advocate" program to represent the class members in monitoring the provision of community living arrangements. During the period of gradual phase-out of Pennhurst as a home for the mentally retarded, the Commonwealth defendants were ordered to take steps to prevent any recurrence of some of the more egregious abuses of residents which the court found to have occurred in the past. The order further empowered the Master to establish a plan to provide alternative employment for all Pennhurst employees. An application for a stay of the March 17, 1978 order was denied by the district court,[5] and a panel of this court denied a stay pending appeal.

A panel of this court heard argument in the case on January 9, 1979. When no single opinion could command majority support, the case was set down for en banc disposition. Thereafter, renewed motions for a stay pending appeal were considered by the court en banc and on August 6, 1979, the court reserved judgment thereon, except that the order appealed from was "stayed to the extent that it shall not apply to transfers out of Pennhurst of any resident whose parents or guardian fails to sign a written consent to such transfer." In other respects, its implementation has gone forward pending appeal.

## II. UNITED STATES INTERVENTION

The Commonwealth defendants, relying on *United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977), contend that the court erred in permitting the United States to intervene as a plaintiff. In *Solomon* the United States filed a complaint charging the State of Maryland with violating the rights of mentally retarded residents of the Rosewood State Hospital. The district court dismissed the action, holding that the United States lacked authority to bring it. The Fourth Circuit affirmed. In the instant case, equating intervention under Rule 24 with the original action in *Solomon*, the Commonwealth defendants urge that *Solomon* be followed and intervention by the United States disapproved. Of course, since the Halderman and PARC appeals defend the order appealed from on all the same grounds that the United States does, the resolution of the federal government's right to participate has no effect on the merits of the appeal. But its standing as an intervenor would determine the standing of the United States to seek or oppose Supreme Court review. Thus it is appropriate that we address that question.

---

4. The court entered judgment in favor of the defendants on the claim for money damages, and no appeal has been taken from that determination.

5. *Halderman v. Pennhurst State Sch. & Hospital*, 451 F.Supp. 233 (E.D.Pa.1978).

In *Solomon* the Fourth Circuit acknowledged the numerous federal statutes evidencing a federal interest in, concern for, and activity with respect to the mentally retarded.[6] It pointed out that no statute expressly authorized the United States to bring suit to challenge the alleged deprivation of the rights of the retarded. Reviewing and purporting to distinguish numerous cases sustaining the authority of the United States to sue in the absence of such express statutory authorization,[7] the court said:

> [W]e decline to hold that in the absence of specific authority the United States may sue in the instant case. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 [, 72 S.Ct. 863, 96 L.Ed. 1153] (1952)—the so-called "Steel Seizure Case"—is one of the reasons for our decision. It raised the question of whether the President had the authority to seize the nation's steel industry in an effort to prevent a crippling steel strike during the Korean War. Because the President had no statutory or constitutional authority to seize

the mills, the Court held that the seizure was illegal and improper.

The case is important here because of the light that it sheds on the doctrine of separation of powers.

563 F.2d at 1128.

We do not find persuasive the *Solomon* court's analogy between President Truman's nonjudicial seizure of the steel mills by military force and a judicial proceeding to obtain injunctive relief enforcing legislative policies in aid of the mentally retarded. There is all the difference in the world for separation of powers purposes between a naked exercise of executive power and executive branch resort to the judicial branch for relief which Congress has not expressly prohibited. The President is, after all, charged with the responsibility to "take Care that the Laws be faithfully executed . . . ." U.S.Const. art. II, § 3. When, in an effort to do so, he resorts to an Article III court under a recognized grant of federal jurisdiction such as 28 U.S.C. § 1345, and that court finds no legislative prohibition against that resort, the lawsuit cannot rea-

---

6. These included §§ 1905(c) and (d) of Title XIX of the Social Security Act, 42 U.S.C. § 1396d(c), (d) (1976); the Education of the Handicapped Act, 20 U.S.C. §§ 1401–1461 (1976); the Developmental Disabilities Services and Facilities Construction Act, 42 U.S.C. §§ 2661–2666 and 2670–2677c, as amended by the Developmentally Disabled Assistance and Bill of Rights Act, Pub.L.No. 94–103, 89 Stat. 496, 42 U.S.C. §§ 6001–6081 (1976); the surplus food program, 7 U.S.C. § 1431 (1976); and the school lunch program for institutionalized children, 42 U.S.C. § 1761 (1976).

7. *See, e. g., New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (suit to enjoin publication of the Pentagon Papers); *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895) (suit to enjoin strike affecting interstate commerce); *United States v. San Jacinto Tin Co.*, 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747 (1888) (suit to set aside patent to land procured by fraud); *United States v. Bell Telephone Co.*, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450 (1888) (suit to set aside invention patent obtained by fraud); *United States v. Brand Jewelers, Inc.*, 318 F.Supp. 1293 (S.D.N.Y.1970) (suit to enjoin systematic due process violations in collection of consumer credit obligations). Perhaps not surprisingly, the strongest resistance to the standing of the United States to sue in the absence of an express statutory authorization has arisen out

of its efforts to enforce civil rights. As the *Solomon* court put it:

> Congressional concern with federal-state relations in the area of civil rights is sufficiently great that we are reluctant to sustain nonstatutory executive acts in all but the clearest case.

563 F.2d at 1129. *See also United States v. School Dist. of Ferndale*, 400 F.Supp. 1122 (E.D.Mich.1975), *aff'd in part and remanded in part*, 577 F.2d 1339 (6th Cir. 1978); *United States v. County School Bd., Prince George County*, 221 F.Supp. 93 (E.D.Va.1963); *United States v. Biloxi Mun. School Dist.*, 219 F.Supp. 691 (S.D.Miss.1963), and *United States v. Madison County Bd. of Educ.*, 219 F.Supp. 60 (N.D. Ala.1963), *both aff'd on other grounds*, 326 F.2d 237 (5th Cir.), *cert. denied*, 379 U.S. 929, 85 S.Ct. 324, 13 L.Ed.2d 341 (1964). We see in the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001–6081 (1976) and § 504 more concern for the handicapped than for federal-state relations. Congress must be aware, from the annual reports of the Attorney General (1974, p. 7374; 1975, pp. 85–86; 1976, pp. 111–112; 1977, pp. 161–162), that a litigation program intended to strengthen the rights of mentally retarded persons is an ongoing Justice Department activity. It has not reacted negatively.

sonably be seen as an invasion of the powers of Congress. Before relief can be given in such a suit, one branch, the executive, must seek it, while a second branch, the judiciary, must agree that it is authorized by the law promulgated by a third branch. If the judiciary has, in an individual case, misconstrued the law, Congress can, constitutional pronouncements aside, change the rule for the future. If Congress wishes to withhold from the executive branch the civil remedies available under the Federal Rules of Civil Procedure, it can by specific legislation say so. Thus, we find unconvincing the separation of powers argument invoked by the *Solomon* court to reject executive branch enforcement of federal law.[8]

■ In this case, however, we need not decide whether absent the Halderman action the United States could independently have sued. The suit was already pending. Moreover, in its constitutional dimensions the suit was expressly authorized by 42 U.S.C. § 1983. We hold that the initial plaintiffs have standing to enforce federal statutory claims as well. *See* p. 95 *infra*. Thus Congress has made the decision that someone could seek the injunctive relief in question. Intervention presented no danger that the federal executive would be initiating a lawsuit that Congress somehow never intended. Intervention was sought pursuant to Rule 24, Fed.R.Civ.P. 24, and there was ample justification for permitting it. Under Rule 24(b)(2), a district court may allow intervention when an applicant's claim or defense and the main action have common questions of law or fact. Rule 24(b) makes specific provision for intervention by governmental agencies interested in statutes, regulations, or agreements relied upon by the parties in the action. Here, as noted below, there is extensive federal legislation directed toward the well-being of the mentally retarded. Several executive branch agencies, especially the Department of Health, Education and Welfare (HEW), have important responsibilities under that

legislation. Large amounts of federal funds flow to Pennsylvania from the federal government, and the United States is vitally interested in the enforcement of the conditions on which those grants are made. One such condition is compliance with governing federal law. Had the United States sought to do so, it could have brought suit to enforce the conditions attached to its grants.[9] Clearly, then, the district court did not abuse its discretion in permitting intervention under Rule 24.

## III. FACTUAL FINDINGS

Neither the Commonwealth nor the County defendants take serious issue with the court's findings of fact respecting the abominable conditions to which Pennhurst residents have been subjected. They do contend, however, that despite those findings there was no legal basis for the grant of any injunctive relief, and, alternatively, that the scope of the relief ordered was broader than was warranted by the facts or the law.

At the time of trial Pennhurst housed 1230 mentally retarded individuals, some of whom also suffered from physical disabilities. The residents are not mentally ill, have broken no laws, and are not a danger to others, although, in severe cases, some are unable to care for themselves. Mental retardation is an impairment in learning capacity and adaptive behavior, and is not treatable, like mental illness, by means of drugs or psychotherapy. While the mentally retarded do suffer educational difficulties, the level of their functioning can be improved by individualized training.

Residents come to Pennhurst either because of a commitment order from a state court, or by a "voluntary" admission initiated by a parent or guardian. In either case, the admission is arranged through Base Service Units, operated by the County defendants pursuant to the Pennsylvania

---

**8.** *See* Gibbons, *The Interdependence of Legitimacy: An Introduction to the Meaning of Separation of Powers,* 5 Seton Hall L.Rev. 435 (1974).

**9.** *See United States v. Solomon,* 563 F.2d at 1129 (Butzner, J., concurring), and cases cited.

Mental Health and Mental Retardation Act.[10] The Base Service Units are responsible for evaluating the needs of retarded individuals and determining the appropriate habilitative services.

In addition to large residential institutions like Pennhurst, Pennsylvania operates smaller and less isolated programs referred to as Community Living Arrangements (CLAs). The latter programs reflect a recognition of the principles of normalization for the habilitation of the retarded.[11] Under normalization principles, retarded persons are treated as much as possible like nonretarded persons. The purpose of such treatment is remediation of the delayed learning process so as to develop maximum potential in self-help, language, personal, social, educational, vocational, and recreational skills. These remediation efforts, the trial court found, are in general, much more likely to succeed in smaller living units which are closer to and more reflective of the normal society. In large separate isolated institutions like Pennhurst, however, the retarded generally suffer apathy, stunted growth, and even regression in the skills referred to. The effective result is the imposition or facilitation of increased retardation. Such large institutions, the court also determined, are more expensive to operate than community based alternatives. Perhaps for those and other reasons, it had been the current intention of the Department of Public Welfare to transfer residents from Pennhurst to community residential facilities, supported by specialized services, by some time in the early 1980's. In the five county area, 530 retarded persons already live in CLAs, including 186 former Pennhurst residents.

The district court also found that the environment at Pennhurst is not merely inconsistent with normalization principles, but is actually hazardous to residents. Because of the inadequacies in programming attributable to staff shortages, residents were found to have lost skills already learned. Organized programs of appropriate education and training were found to be inadequate or unavailable. Evaluations of resident progress do not meet minimum professional standards, and record keeping is inadequate.

Moreover, the Pennhurst environment was found to be unsanitary. There is often urine and excrement on the ward floors. Infectious diseases are common. Obnoxious odors and excessive noise permeate the institution. Most toilet areas do not have towels, soap or toilet paper. Injuries to residents by other residents or through self-abuse are common. Serious injuries inflicted by staff members, including sexual assaults, have occurred. Physical restraints, which may be physically harmful and which have caused injuries and at least one death, are resorted to more frequently than appropriate because of shortages of staff. Dangerous psychotropic drugs are used for purposes of behavior control and staff convenience, rather than for legitimate treatment needs. Such drug misuse produces lethargy, hypersensitivity to sunlight, inability to maintain gait, and other disabilities. Seclusion in solitary confinement has been used to punish aggressive behavior which might not have occurred if a proper regimen of training were available. Diet control is not possible because residents dine in large group eating areas without adequate staff supervision.

The federal government is a substantial partner in the Commonwealth's and Counties' provision of services generally available, although not always provided, to the

---

10. Pa.Stat.Ann. tit. 50 § 4301(d)(9) (Purdon 1969), states in relevant part:

   (d) . . . it shall be the duty of local authorities in cooperation with the department [of Public Welfare] to insure that the following mental health and mental retardation services are available:

   \*      \*      \*      \*      \*      \*

   (9) Unified procedures for intake for all county services and a central place providing referral services and information.

11. For a description of the normalization principle in the care of the mentally retarded, see B. Nirje, The Normalization Principle, Changing Patterns in Residential Services for the Mentally Retarded, President's Committee on Mental Retardation, 231 (Rev.ed.1976).

mentally retarded. The Commonwealth Department of Welfare receives federal grants under both the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001–6081 (1976), and the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401–1461 (1976). The Commonwealth, in turn, makes funds available to the Counties for purposes of developing and maintaining their CLAs. Thus it is clear that there are county based programs open and available to the mentally retarded which receive federal financial assistance. The trial court found that the Counties have made an insufficient effort to provide community based services to the retarded.[12] The population of Pennhurst has thus remained high, effectively precluding the residents from taking advantage not only of federally funded programs expressly intended for the care of the retarded, but also of various other federally funded facilities such as education and transportation.

The court held that the isolation at Pennhurst is attributable, across the board, to state action. It found that about half of the Pennhurst residents had been committed there by order of a Pennsylvania court, while the other half had been admitted upon application of a parent or guardian. Although the latter group of residents are referred to in some of the briefs as voluntary admittees, theoretically free to leave when of age, the court found that when a resident wishes to leave and the Pennhurst staff determines that there is no place for him in the community, or that he is not ready for community living, a petition for involuntary commitment is made. The court found, moreover, that many residents do not understand the available alternatives to institutionalization, or are physically unable to express an interest in leaving, or have no adequate alternative living arrangement. Thus the notion of voluntariness in admission and retention was found to be illusory.

## IV. PREFERRED LEGAL BASES FOR RELIEF

Appellants, as we noted above, do not quarrel with the facts; they dispute only the legal significance of those facts. They reject both the court's conclusion that the mentally retarded have a legal right to treatment or habilitation and its conclusion that treatment or habilitation must be provided in the least restrictive environment. Moreover, even assuming that these rights exist, appellants challenge the court's injunctive order as overbroad. We consider in turn each of these objections.

The district court's determination that appellees have a right to treatment was predicated upon constitutional, federal, and state statutory grounds. The federal courts have long been directed to decide whether causes of action can be supported on statutory grounds before they adjudicate constitutional law issues.[13]

Moreover, while federal courts can interpret federal legislation definitively, subject only to Supreme Court review, their interpretation of a state statute arguably supporting the judgment might be rejected by the state's courts. The preferred order, therefore, is to turn first to the federal statutory issues. Thereafter, we will consider state statutory grounds for the trial court's decision.

---

12. The trial court found that because the Commonwealth has chosen to pay all of Pennhurst's costs not federally funded, while requiring the Counties to pay 10% of the cost of some community based services, the Counties have a financial incentive to send retarded residents to Pennhurst rather than attempting habilitation within the community. 446 F.Supp. at 1312. See Record, Vol. 30, at 12, 23 (testimony of Ms. E. A. Ballard). The County defendants urge that the finding that they have such a financial incentive is clearly erroneous. We need not resolve that question, since the basis on which we decide the legal issues is not dependent upon the motive of the Counties.

13. See Hagans v. Lavine, 415 U.S. 528, 543, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); Siler v. Louisville & Nashville R.R. Co., 213 U.S. 175, 193, 29 S.Ct. 451, 53 L.Ed. 753 (1909).

## V. THE RIGHT TO TREATMENT OR HABILITATION [14]

### A. *Federal Statutory Law*

██ In their second amended complaint, appellees asserted a cause of action under the Developmentally Disabled Assistance and Bill of Rights Act, Pub.L.No. 94–103, 89 Stat. 486 (1975), *codified at* 42 U.S.C. §§ 6001–6081 (1976) [hereinafter "the Act"]. The trial court did not reach the question of defendants' possible liability under this statute. The parties have nevertheless supplied this court with detailed briefing on the statute. We are persuaded that the Act provides the mentally retarded with a right to treatment.

The Act was passed in 1975 as an amendment to the Developmental Disabilities Services and Facilities Construction Act. It established particular rights and benefits for the developmentally disabled, a class of persons which included the mentally retarded. 42 U.S.C. § 6001(7)(A)(i). Among those was a right to the least restrictive environment, about which we will have more to say in Section VI A below. In addition, however, the Act expressly provided that the developmentally disabled have a right to treatment or habilitation. In the so-called Bill of Rights section, 42 U.S.C. § 6010, Congress made plain its intention to establish a right to treatment.[15] Congress found

---

14. Throughout this section the terms "treatment" and "habilitation" will be used interchangeably. Strictly speaking, since mental retardation is not a curable disability, the term "treatment" is inappropriate. Rather, "habilitation," which refers to "that education, training and care required by retarded individuals to reach their maximum development," 446 F.Supp. at 1298, is the more appropriate term. Nevertheless, because the relevant statutory and constitutional sources typically apply both to the mentally ill—who can be treated—and to the mentally retarded, who can only be educated, trained and cared for, we will employ both words interchangeably.

15. § 6010. Congressional findings respecting rights of developmentally disabled

Congress makes the following findings respecting the rights of persons with developmental disabilities:

(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.

(2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.

(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any institutional or other residential program for persons with developmental disabilities that—

(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such persons; or

(B) does not meet the following minimum standards:

(i) Provision of a nourishing, well-balanced daily diet to the persons with developmental disabilities being served by the program.

(ii) Provision to such persons of appropriate and sufficient medical and dental services.

(iii) Prohibition of the use of physical restraint on such persons unless absolutely necessary and prohibition of the use of such restraint as a punishment or as a substitute for a habilitation program.

(iv) Prohibition on the excessive use of chemical restraints on such persons and the use of such restraints as punishment or as a substitute for a habilitation program or in quantities that interfere with services, treatment, or habilitation for such persons.

(v) Permission for close relatives of such persons to visit them at reasonable hours without prior notice.

(vi) Compliance with adequate fire and safety standards as may be promulgated by the Secretary.

(4) All programs for persons with developmental disabilities should meet standards which are designed to assure the most favorable possible outcome for those served, and—

(A) in the case of residential programs serving persons in need of comprehensive health-related, habilitative, or rehabilitative services, which are at least equivalent to those standards applicable to intermediate care facilities for the mentally retarded promulgated in regulations of the Secretary on January 17, 1974 (39 Fed.Reg. pt. II), as appropriate when taking into account the size of the institutions and the service delivery arrangements of the facilities of the programs;

(B) in the case of other residential programs for persons with developmental disabilities, which assure that care is appropriate to the needs of the persons being served by such programs, assure that the persons admitted to facilities of such programs are persons whose needs can be met through serv-

that "[p]ersons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities." 42 U.S.C. § 6010(1). Moreover, both "[t]he Federal Government and the States . . . have an obligation to assure that public funds are not provided to any institutional or other residential program for persons with developmental disabilities that— (A) does not provide treatment, services, and habilitation which is appropriate to the needs of such persons . . . ." 42 U.S.C. § 6010(3)(A). It is hard to see how Congress could have been any more precise in revealing its intention to confer a right to treatment or habilitation.

Another section of the Act reaffirms the right to treatment. Section 6063 provides that any state which wishes to take advantage of the subchapter must submit a plan to the Secretary of HEW. That plan must contain a program designed, *inter alia*, "to improve the quality of care and the state of surroundings of persons for whom institutional care is appropriate. . . ." 42 U.S.C. § 6063(b)(20)(B). While this section was deleted in the 1978 revision of the Act, it did apply until that date and retains legal significance for purposes of this litigation. Moreover, the revised statute contains a section requiring states to conform their plans to the dictates of the Bill of Rights provision, section 6010. *See* 42 U.S.C. § 6063(b)(5)(C) (Supp.1979).

The legislative history of Pub.L.No. 94–103 also supports the recognition of a statutory right to treatment for the mentally retarded. Congressman Carter, in introducing H.R. 4005 (later enacted as Pub.L.No. 94–103) in the House, stated that among its many purposes "[t]his legislation · . . . directs that States should devote attention to improving the facilities and surroundings of institutions where people have been appropriately institutionalized." 121 Cong. Rec. 9976 (1975). The bill was introduced in the Senate as S. 462. 121 Cong. Rec. 16,470.

Senator Stafford, discussing the purpose of Title II—the Bill of Rights—stated "Title II was added to the bill to assist in the protection of the rights guaranteed under our Constitution for those individuals that will require institutionalization. . . ." *Id.* at 16,516. Senator Javits added that "Congress should reaffirm its belief in equal rights for all citizens—including the developmentally disabled. Congress should provide the leadership to change the tragic warehousing of human beings that has been the product of insensitive Federal support of facilities providing inhumane care and treatment of the mentally retarded." *Id.* at 16,519. Senator Cranston observed that while the bill endorsed deinstitutionalization, it "recognize[d] that the need for some long-term residential programs will remain. The bill specifically provides that where institutional programs are appropriate, adequate support should be planned for them so that necessary treatment and habilitation programs can be given residential patients to develop their full potential." *Id.* at 16,520. Senator Schweiker described one of the requirements of the proposed legislative Bill of Rights as "[h]umane care, treatment, rehabilitation, and protection in residential facilities. . . ." *Id.* at 16,522.

The bill went to conference, in part because the Senate bill contained an expanded version of Title II—specifying in great detail the standards for appropriate care— with which the House did not concur. The Conference Committee compromised on details, and produced the more general, yet equally forceful Bill of Rights provisions, now codified in section 6010. A right to treatment was, as we noted above, specifically proclaimed. Thus, the Conference Report for the bill states that "the developmentally disabled have a right to appropriate treatment, services and habilitation . . . ." H.R.Conf.Rep. No. 94–473, 94th Cong., 1st Sess. 42 (1975), *reprinted in*

---

ices provided by such facilities, and assure that the facilities under such programs provide for the humane care of the residents of the facilities, are sanitary, and protect their rights; and

(C) in the case of nonresidential programs, which assure the care provided by such programs is appropriate to the persons served by the programs.

[1975] U.S.Code Cong. & Ad. News, 943, 961. In addition, Senators Javits, Schweiker and Williams, in approving the Conference Report, all called attention to the critical role of the right to treatment. 121 Cong.Rec. 29,820–21. We therefore hold that the Developmentally Disabled Assistance and Bill of Rights Act grants to the mentally retarded a right to treatment and habilitation.

We further hold that retarded persons have a private right of action under the Act. To date, only one other court has considered whether private litigants may enforce the rights granted under the Act. In *Naughton v. Bevilacqua,* 458 F.Supp. 610 (D.R.I.1978), Judge Pettine concluded that there was a private right of action. Plaintiffs in *Naughton* were a mentally retarded, schizophrenic patient and his father. They brought suit for injunctive relief and damages, alleging that the child had sustained injuries as a result of drugs administered to him in a Rhode Island institution. Among their several causes of action, plaintiffs asserted a claim under 42 U.S.C. §§ 6001–6081.

The court, reviewing the statute, concluded that it intended to convey a private right of action. Judge Pettine offered several arguments supporting his view of Congressional intent. First, he noted, section 6010, the Bill of Rights provision, has two sections: the first "declares the right to appropriate treatment"; the second "provides that federal funds are available only to programs that meet certain basic minimum standards and offer 'appropriate' treatment." 458 F.Supp. at 616. "This dichotomy in sec. 6010," the court reasoned, "suggests that denial of funds is not the only mechanism to enforce the declared statuto-

ry rights." *Id.* In addition, the court noted that the Conference Report expressly states that " 'this right the Conference Report expressly states that " 'this right [to receive appropriate treatment] should be protected and assured by the Congress and the courts.' " *Id.* (quoting [1975] U.S.Code Cong. & Ad. News 961). Furthermore, participating states are required under the Act "to establish an independent agency 'to protect and advocate the rights of persons with developmental disabilities, and . . . to pursue *legal,* administrative, and other appropriate remedies to insure the protection of the rights of such persons who are receiving treatment, services or habilitation within the State . . . .' " *Id.* (quoting 42 U.S.C. § 6012(a)). As the court observed, "[t]he enforcement of individual rights . . . cannot be achieved solely by withholding federal funds; not only is the Secretary incapable of investigating every violation, but the Secretary may quite properly be unwilling to withhold funds for a single violation. Thus, the advocacy agency and a private right of action are crucial to protect the rights secured by the Act." *Id.* Finding that the developmentally disabled were the "especial benefi[ciaries]" of the Act, that private suits would effectuate the policies of the statute, and that they would not infringe traditional state prerogatives, the *Naughton* court concluded that there was a private right of action under 42 U.S.C. §§ 6001–6081.

We find the *Naughton* court's analysis persuasive. A private right of action eminently satisfies the standards articulated in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).[16] As developmentally disabled persons, the mentally retarded undoubtedly qualify as "especial ben-

16. *Cort v. Ash* set forth four relevant factors to be considered in determining whether a private remedy is implicit in a statute: whether the plaintiffs are especial beneficiaries of the statute, whether there is any indication of legislative intent to create a private remedy, whether a private remedy would further the policies of the statute, and finally whether the cause of action is one traditionally relegated to the states. *See Cannon v. Univ. of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)

(implying private right of action under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (1976), a civil rights statute); Note, *Implied Rights of Action to Enforce Civil Rights: The Case for a Sympathetic View,* 87 Yale L.J. 1378 (1978). *Cf. Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (refusing to imply private action for damages under § 17(a) of the Securities and Exchange Act of 1934, clearly not a civil rights statute).

efi[ciaries]" of the section 6010 grant of a right to treatment. In addition, the Conference Report recognized the desirability of enforcement of the Act, in part, by the courts. Moreover, a private right of action would surely further the purposes of the Act. By permitting private suits, courts would facilitate improvements in the delivery of services to the disabled without forcing the federal government to resort to the drastic remedy of a cut-off of funds.

It may be argued, however, that while the first three *Cort v. Ash* criteria are satisfied, the implication of a private right of action would infringe basic state prerogatives, and transgress the bounds of federal law making competence, inasmuch as mental health policies have always been within the states' traditional police power authority. We are unpersuaded by that argument. While providing for the health and well-being of the citizenry is surely a legitimate state function, Congress' recognition of a right to treatment in section 6010 is not a simple displacement of that admittedly basic state concern.

In *Ingraham v. Wright*, 430 U.S. 651, 673, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977), the Supreme Court said that among the liberties protected by the fourteenth amendment is "a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security." Section 5 of the fourteenth amendment vests Congress with authority "to enforce, by appropriate legislation, the provisions of this article."

In Section 6010, Congress has legislated with respect to the state intrusions on personal security of the developmentally disabled.[17] Thus, in providing specific guarantees for a particular affected group, Congress' action is consistent with the Supreme Court's recognition of the broad underlying right protected against impairment by the state through the fourteenth amendment. Section 6010 does not go beyond what has been judicially declared to be the limits of the fourteenth amendment but clearly is within those bounds.[18] Since the rights described in section 6010 are specified pursuant to section 5 of the fourteenth amendment, implication of a private cause of action from that statute rests upon the same constitutional footing. Thus we are not dealing with the implication of a private cause of action from a congressional enactment justified only by the spending power of the federal government, and we need not address the question whether such a statute could ever provide the predicate for private substantive rights. As the Supreme Court acknowledged in another context, Congress may, under section 5, establish certain restrictions that might otherwise implicate the prerogatives of the states.[19]

We also note that any suggestion that private enforcement of the Act usurps basic state concerns is vitiated by the structure of the Act itself. For example, section 6063(b)(20)(B), which until 1978 required states to produce a plan providing for im-

---

17. That Congress intended in §§ 6001–6081 to enforce recognized constitutional rights is amply borne out by the legislative history of the Act. *See* 121 Cong.Rec. 16,516 (1975) (remarks of Sen. Stafford). Moreover, Senator Javits, speaking in support of the measure, cited *Wyatt v. Stickney*, 344 F.Supp. 387 (M.D. Ala.1972), 344 F.Supp. 373 (M.D.Ala.1972), *enforcing*, 325 F.Supp. 781 (M.D.Ala.1971), *affirmed in relevant part, remanded in part, and decision reserved in part, Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974) (Constitution guarantees persons civilly committed to state mental institutions a right to treatment and granting relief does not invade exclusive province of state legislature), as an articulation of "constitutionally required minimum standards for the care and treatment of mentally retarded patients." *Id.* at 16,519.

18. *Cf. Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); *Katzenbach v. Morgan*, 384 U.S. 641, 658, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (§ 4(e) of Voting Rights Act of 1965 is proper exercise of congressional powers under § 5 of fourteenth amendment). *See generally*, Cox, *Foreword: Constitutional Adjudication and the Promotion of Human Rights*, 80 Harv.L.Rev. 91 (1966).

19. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Usery v. Allegheny County Inst. Dist.*, 544 F.2d 148, 155 (3d Cir. 1976), *cert. denied*, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977); *cf. National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976).

proved quality of care, was applicable to all those states "desiring to take advantage of this subchapter." 42 U.S.C. § 6063(a). Congress thus invoked its spending clause powers to condition the grant of federal monies on the provision by the states of adequate care. Pennsylvania has accepted federal funds provided pursuant to the Act.[20] Whatever argument it might otherwise have had were it faced with an unexpected set of federal obligations is refuted by its obvious willingness to accept the benefits of the Act.[21]

Finally, we have recently decided that a private right of action exists for the enforcement of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976)—another statute designed to improve the lives of handicapped persons. *National Association for the Advancement of Colored People v. The Medical Center, Inc.,* 599 F.2d 1247, 1258–59 (3d Cir. 1979).[22] We did not feel, in that case, that the traditional police power duties of the states foreclosed a private right of action. In view of these considerations, then, we hold that appellees have

**20.** *See* Commw. of Pa., Governor's Executive Budget 1979–80 at 638. We need not decide whether the obligations of § 6010 apply even to those states which do not accept federal funds under the Act. As to those states, this spending clause analysis would not apply. For the reasons elaborated at p. 98, *supra,* and p. 99 n. 21 *infra,* we doubt that the concerns for state autonomy—indicated in *National League of Cities*—would prevail over a congressional announcement of fourteenth amendment policy. But we need not address that issue here. It is sufficient for our purposes to note that Pennsylvania has accepted federal funds and has thus consented to federally mandated standards for the treatment and habilitation of the developmentally disabled.

**21.** *Cf. Developments in the Law—Zoning,* 91 Harv.L.Rev. 1427, 1617 (1978) ("nothing in *National League of Cities* or in related principles of federalism would prevent Congress from using the spending power to require that states receiving federal funds for the development and administration of land use programs abide by federal specifications"). For these same reasons we would reject, were it made, any contention that §§ 6001–6081 are unconstitutional under *National League of Cities. Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), recognizes that *National League of Cities* is inapplicable to legislation promulgated pursuant to § 5 of the fourteenth amendment. 427 U.S. at 453–56, 96 S.Ct. 2666. This court reached the same conclusion with respect to the Equal Pay Act. *Usery v. Allegheny County Inst. Dist.,* 544 F.2d 148 (3d Cir. 1976), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977). Moreover, we note that the Supreme Court itself has chosen to read the state reserved powers language in *National League of Cities* narrowly. In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court held that cities and subdivisions of a state that engage in anticompetitive practices without authorization are subject to federal antitrust liability. The *Lafayette* Court paid scant attention to *National League of Cities,* thus suggest-

ing that even under the commerce clause federal statutes may be enforced against the states. *See* 435 U.S. at 423–24, 98 S.Ct. at 1142 (Burger, C. J., concurring in Part I of the opinion and in the judgment) ("[t]he *National League of Cities* opinion focused its delineation of the 'attributes of sovereignty' . . . on a determination as to whether the State's interest involved "functions essential to separate and independent existence." . . . It should be evident, I would think, that the running of a business enterprise is not an integral operation in the area of traditional government functions."). (Quoting *National League of Cities v. Usery,* 426 U.S. at 845, 96 S.Ct. 2465, quoting *Coyle v. Oklahoma,* 221 U.S. 559, 580 (1911)).

The author of this opinion notes that even assuming, arguendo, that the provision of habilitation *is* within the sphere of the states' autonomy, that does not end the matter; "[t]o determine whether the federal action is unconstitutional requires a balancing of the federal interests, on the one hand, against the degree of federal intrusion upon state autonomy on the other." *Developments in the Law—Zoning,* 91 Harv.L.Rev. 1427, 1613 n.159 (1978). *See National League of Cities,* 426 U.S. at 852, 853, 96 S.Ct. at 2475 (distinguishing *Fry v. United States,* 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975), which upheld a temporary freeze on wages of state and municipal employees, in part on the ground that "[t]he enactment at issue there was occasioned by an extremely serious problem. . . ."); *id.* at 856, 96 S.Ct. at 2476 (Blackmun, J., concurring). Here, Congress has found that certain rights must be recognized in order that disabled persons realize their basic constitutional liberties. The balance, in my view, plainly favors the legislation.

**22.** In *Southeastern Community College v. Davis,* 442 U.S. 397, 404 n.5, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979), the Supreme Court expressly avoided deciding whether there exists a private right of action under section 504. The Court went on, however, to reach the merits of the plaintiff's cause of action.

standing to sue to enforce the Bill of Rights provisions of the Act.

One court, we note, has held that claims under the Act must be brought in state court. *United States v. Solomon,* 563 F.2d at 1125. The *Solomon* court acknowledged that the Conference Report on the Act stated that the right to treatment "should be protected and assured by the Congress and the courts." 563 F.2d at 1124. It held, however, that this language "manifestly refers to a state judicial forum and not to a federal judicial forum where the United States customarily sues." *Id.* at 1125.

█ With deference to the Fourth Circuit, we see nothing manifest in the Conference Report supporting that court's interpretation. If anything, the legislative history reflects a Congressional belief that States were not spending funds for the disabled effectively. The Developmentally Disabled Assistance and Bill of Rights Act sought to change the traditional spending habits of the states. It is most unlikely that Congress intended those changes to be enforceable only in state courts.[23] We would find it quite anomalous in the absence of a clear congressional expression to hold that a federal statute created a cause of action arising under federal law, but enforceable only in the state courts and not under 28 U.S.C. § 1331 (1976).

Accordingly, we hold that appellees have a federal statutory right to habilitation, that they may sue to enforce that right, and that such suit is properly lodged in federal court.

B. *State Law*

As an alternative ground for a right to adequate habilitation, appellees point to sections 101–704 of Pennsylvania's Mental Health and Mental Retardation Act of 1966 [hereinafter MH/MR Act of 1966], Pa.Stat. Ann. tit. 50, §§ 4101–4704 (Purdon 1969). The trial court accepted this contention, relying principally upon section 201 of the Act. That section, which establishes the responsibilities of the Department of Public Welfare, provides in pertinent part:

> The department shall have power, and its duty shall be:
>
> (1) To assure within the State the availability and equitable provision of adequate mental health and mental retardation services for all persons who need them . . . . .

Pa.Stat.Ann. tit. 50, § 4201. The court held that this section grants retarded persons an affirmative right to minimally adequate habilitation. 446 F.Supp. at 1322. Moreover, it noted, the County defendants share in this statutory duty to supply adequate treatment. *Id.* at 1322–23.

█ Section 201 refers to the state's "duty" to "assure" the "availability . . . of adequate mental health and mental retardation services for all persons who need them. . . ." Pa.Stat.Ann. tit. 50, § 4201(1). That language is broad and determined: the obligation to provide services to the mentally handicapped on the basis of need. Had the Commonwealth intended to offer only confinement without more, it would hardly have spoken in terms of "adequate . . . services." *Id.*

Our reading of the statutory language is amply supported by the legislative history of the MH/MR Act of 1966. Speaking on behalf of the Act in the Pennsylvania Senate, Senator Pechan elaborated its fundamental habilitative purposes.

> The object of this legislation is to make it possible for every mentally disabled person to receive the kind of treatment he needs, when and where he needs it. It will make those services available to every citizen in every community which are now available only to a lucky few, in the more progressive communities. It will open more beds in the local general hospitals. It will make available the services of psychiatrists and psychologists, of psychiatric nurses and social workers, of specially trained occupational therapists, of

---

**23.** In Part II, p. 91 *supra,* we rejected the *Solomon* court's position that the United States was precluded from judicial enforcement of the

Developmentally Disabled Assistance and Bill of Rights Act.

speech and hearing therapists, of activities directors and of child care workers. It will supplement the benefits of therapy with daytime and evening programs of activity which will call back to reality the erring mind, which will re-create and strengthen the ties which bind one human being to another and make us comfortable in each others' company. It will provide productive activity for those who can work only in a sheltered situation, and for those who are able, it will prepare them to go back to the customary world of business and industry, or to go forth into it for the first time, as the case may be. For those in acute distress, service will be available twenty-four hours a day, and the violent will find protective care instead of the harsh custody of jail.

1966 Pa.Legis.J., 3d Spec.Sess.—No. 33, 76 (Sept. 27, 1966). The Act, Senator Pechan declared, "will [make] it . . . easy for a mentally disabled person to find the treatment he needs. . . ." *Id.* Senator Sesler concurred, *id.* at 77, and added:

When you realize that practically one out of ten of every Pennsylvanian has some problem in mental health, you will realize how vast the scope of this problem is. However, I think, we now have sketched in broad, general terms the framework of a program which can provide a continuum of services—out-patient, in-patient, diagnostic treatment, evaluation and research, a procedure of commitment under almost all conceivable types of circumstances.

*Id.*

Those few courts which have previously considered the MH/MR Act of 1966 have also gleaned from it a right to treatment

for the mentally handicapped. In *In re Joyce Z.*, 123 Pitt.L.J. 181 (1975), the Common Pleas Court for Allegheny County held that a profoundly retarded child had, under section 201 of the Act, a right to treatment. 123 Pitt.L.J. at 187. The court quoted the relevant language of section 201 and declared, "These are brave words. We mean to see that the State, acting through the Department of Public Welfare, abides by them." *Id.* In view of the statutory right to treatment, the court held that Pennsylvania was obliged to provide casework services to the child, her parents, and her foster parents, together with financial assistance to meet the child's physical needs. *Id.* at 190. *Joyce Z* establishes, as well, that the statutory right to treatment is under Pennsylvania law judicially enforceable in a private action.

To like effect was Chief Judge Lord's decision in *Eubanks v. Clarke*, 434 F.Supp. 1022 (E.D.Pa.1977). There, relying in part on section 201 of the MH/MR Act of 1966, Chief Judge Lord held that the plaintiff, an involuntarily committed schizophrenic, had a "state law right to treatment or release." 434 F.Supp. at 1027. Similarly, in *Hoolick v. Retreat State Hospital*, 24 Pa.Cmwlth. 218, 354 A.2d 609 (1976), *aff'd* 476 Pa. 317, 382 A.2d 739 (1978), a Pennsylvania court described the MH/MR Act of 1966 as envisioning a "comprehensive program for the care, treatment and rehabilitation of mentally disabled and mentally retarded persons . . . ." 24 Pa.Cmwlth. at 220, 354 A.2d at 611.[24]

■ Despite the apparent meaning of section 201, and the plain intentions of the state legislature,[25] several of the appellants

---

**24.** *See County of Allegheny v. Commw. Dept. of Pub. Welfare*, 33 Pa.Cmwlth. 267, 269, 381 A.2d 1014, 1016 (1978) (squaring its own holding with the mandate of *Joyce Z.* and *Hoolick* which, in the court's view, required the availability of adequate mental retardation facilities). *Cf. Doe v. Colautti*, 592 F.2d 704, 711–12 (3d Cir. 1979) (citing the MH/MR Act of 1966, and Pennsylvania's "allocation of an extraordinarily large portion of its budget to the treatment of the mentally ill," as reasons to eschew creating

new suspect classification for protection of mentally handicapped).

**25.** While not expressly covering persons who are mentally retarded but not mentally ill, Pennsylvania's Mental Health Procedures Act, Pa.Stat.Ann. tit. 50, §§ 7101–7503 (Purdon) (Supp.1979), promulgated in 1976, also reflects the state's recognition of a need for treatment. Section 102 of the Act provides, in pertinent part:

object to the trial court's reliance on the MH/MR Act of 1966. The Commonwealth and the Counties contend that section 509(5) of the Act belies any duty on their part to provide treatment. Section 509(5) empowers the Department of Public Welfare to distribute grant monies to the Counties where sufficient funds have not been appropriated by the state.

> In the event that sufficient funds to pay the full amount of the grants to which the counties may be entitled under the provisions of this section have not been appropriated, to distribute State funds among the counties by a formula reasonably designed to achieve the objectives of this act, provided however, that in such event the counties' financial obligations under this act shall be reduced in accordance with the same formula and the counties shall be required to provide only those services for which sufficient funds are available.

Pa.Stat.Ann. tit. 50, § 4509(5). The Commonwealth contends that since services to the retarded can be reduced in light of insufficient funding, there cannot be "an unconditional right to those services." Brief for Commonwealth Appellants at 31. The Counties, on the other hand, rely on this section in making their argument that any duty to provide treatment rests solely on the state, and not them. Brief for Suburban County Appellants at 24–25.

■ We reject these contentions. Section 509(5) hardly relieves the Commonwealth of its statutory duties under section 201. Section 509(5) delineates nothing more than the method by which insufficient funds are to be distributed. It states the apparent truism that where the state has failed to provide Counties with full funding, the Counties need not supply a constant level of services. This may, to be sure, imply that the right to treatment is not "unconditional." But no right is without

some limitations. All that section 201 promises, and all that we hold, is that to the extent Pennsylvania maintains facilities for the mentally handicapped, those facilities must provide adequate treatment or habilitation.

■ Nor do we agree with the Counties that section 509(5) absolves them of any duty to provide treatment. The MH/MR Act of 1966 contemplated a joint venture between the Commonwealth and its subdivisions, the Counties, in the provision of services to the mentally handicapped. As Senator Sesler stated, in supporting the Act:

> We want to make it clear, for the record, that we are giving this responsibility to our County Governments, and we are giving them a great deal of money. One of the amendments just adopted today has provided that the State will have to reimburse the counties for ninety per cent of the cost of the program. We are giving them a certain degree of freedom. However, we must remind them that the counties had a program of control for taking care of the mentally ill, prior to 1937, when they failed to do an adequate job. It may be that they lacked the finances at that time, and that they lacked the public's support. However, today, I think that the public's support is there. I trust that the Commonwealth will be there with the adequate finances.

> . . . . .

> I hope that we can focus attention on the local level, because if there was ever an example of a cooperative effort, which involves so many citizens and private groups as this legislation, I do not know what it is. We are going to give it control down on the local level; we are giving it a flexible degree of control. So, I am saying today—at least, I, speaking for myself—that we are charging County

§ 7102. Statement of policy
It is the policy of the Commonwealth of Pennsylvania to seek to assure the availability of adequate treatment to persons who are mentally ill, and it is the purpose of this act to establish procedures whereby this policy

can be effected. . . . Treatment on a voluntary basis shall be preferred to involuntary treatment; and in every case, the least restrictions consistent with adequate treatment shall be employed.
Pa.Stat.Ann. tit. 50, § 7102.

Governments with this tremendous responsibility. We hope that they will take these words to heart . . . .

1966 P.Legis.J., 3d Spec.Sess.—No. 33, 77 (Sept. 27, 1966). Section 509(5) in no way undercuts the intended partnership of the Counties and the Commonwealth.

■ The Counties contend, however, that while they may have *some* responsibilities under the Act to provide habilitation to the retarded, those responsibilities are exhaustively specified in section 301(d), and no other duties—such as habilitation at institutions or community living arrangements—can be imposed upon them.[26] We reject this suggestion. It is true that section 301(d) sets forth specific duties for the Counties. Nevertheless, the Counties' mandate under the Act is much broader. Section 301(a), for example, states, in pertinent part:

> The local authorities of each county separately or in concert with another county or counties, as the secretary may approve, shall establish a county mental health and mental retardation program for the prevention of mental disability, and for the diagnosis, care, treatment, rehabilitation and detention of the mentally disabled and shall have power to make appropriations for such purposes.

Pa.Stat.Ann. tit. 50, § 4301(a). This section directs that local authorities establish a "mental health and mental retardation program for the . . . . treatment, rehabilitation and detention of the mentally disabled. . . ." *Id.* Thus, although section 4301(d) specifies certain facilities for which the Counties will be principally responsible, the Act as a whole contemplates County participation in all facets of the state's provision of services. Indeed, in the case of Pennhurst itself, the Counties have joined inextricably in the state's provision—or lack of provision—of treatment. As we noted in Part III above, the Counties arrange for admission to Pennhurst through their operation of Base Service Units. Often, the district court found, the County Base Service Units fail to investigate alternatives to institutional placements, thereby consigning the mentally retarded to inadequate living conditions. 446 F.Supp. at 1313. Having thus participated for so long in the institutional practices at Pennhurst, the Counties cannot at this late date escape—by pointing the finger of responsibility elsewhere—the statutory duty to provide adequate habilitation.

Accordingly, we hold that the appellees have a state statutory right to habilitation, that they may sue to enforce that right, and that a federal court has pendent jurisdiction, which was properly exercised in this instance, to enforce that right.

## VI. THE RIGHT TO THE LEAST RESTRICTIVE ENVIRONMENT

Having concluded that appellees have a right to treatment, we turn to a consideration of the setting in which that treatment must be provided. Plaintiffs contend that the state is obligated to provide habilitation in an environment that infringes least on

---

**26.** Section 301(d) of the Act provides:

Subject to the provisions of sections 508 and 509(5) it shall be the duty of local authorities in cooperation with the department to insure that the following mental health and mental retardation services are available:

(1) Short term inpatient services other than those provided by the State.

(2) Outpatient services.

(3) Partial hospitalization services.

(4) Emergency services twenty-four hours per day which shall be provided by, or available within at least one of the types of services specified heretofore in this paragraph.

(5) Consultation and education services to professional personnel and community agencies.

(6) Aftercare services for persons released from State and County facilities.

(7) Specialized rehabilitative and training services including sheltered workshops.

(8) Interim care of mentally retarded persons who have been removed from their homes and who having been accepted, are awaiting admission to a State operated facility.

(9) Unified procedures for intake for all county services and a central place providing referral services, and information.

(Footnote omitted). Pa.Stat.Ann. tit. 50, § 4301(d).

the personal liberties of the mentally retarded. The trial court agreed, predicating the decision exclusively upon constitutional grounds. The court reasoned that because "[a]ll admissions to state facilities . . . entail an infringement on fundamental rights and freedoms . . .[,] due process demands that if a state undertakes the habilitation of a retarded person, it must do so in the least restrictive setting consistent with that individual's habilitative needs." 446 F.Supp. at 1319. While there is substantial caselaw support for the trial court's constitutional position,[27] our resolution of the present controversy on statutory grounds obviates the necessity for consideration of this constitutional issue. Two federal statutes were relied upon in the district court as sources of a right to the least restrictive environment: The Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001–6081 (1976), discussed at pp. 95–100 *supra,* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976).[28]

### A. *The Developmentally Disabled Assistance and Bill of Rights Act.*

In Part V A above we addressed the origins and development of this statute. We noted there that the Act enunciates a right to treatment for the developmentally disabled. In addition to that right, however, the Act expresses a clear congressional preference for deinstitutionalization. Section 6010 states plainly that "the treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty." 42 U.S.C. § 6010(2). State plans were required, until 1978, to "contain a plan designed . . . to eliminate inappropriate placement in institutions of persons with developmental

disabilities . . . ." 42 U.S.C. § 6063(b)(20). Moreover, they were obligated to:

> support the establishment of community programs as alternatives to institutionalization and support such programs which are designed to provide services for the care and habilitation of persons with developmental disabilities, and which utilize, to the maximum extent feasible, the resources and personnel in related community programs to assure full coordination with such programs and to assure the provision of appropriate supplemental health, educational, or social services for persons with developmental disabilities . . . .

42 U.S.C. § 6063(b)(23). Finally, the plans were required to provide:

> the maximum utilization of all available community resources including volunteers serving under the Domestic Volunteer Service Act of 1973 (Public Law 93–113) and other appropriate voluntary organizations except that volunteer services shall supplement, but shall not be in lieu of, services of paid employees. . . .

42 U.S.C. § 6063(b)(26).

The legislative history of the Act supports the preference for deinstitutionalization. Introducing the bill in the House, Congressman Carter stated:

> This bill encourages the States to adopt programs of deinstitutionalization. We, as a committee, are well aware that treatment of the developmentally disabled should be conducted in that person's community without unnecessarily institutionalizing him. Funds have been earmarked for this purpose.

121 Cong.Rec. 9976 (1975). Referring to another bill, Congressman Carter said its: "main thrust . . . was to minimize the necessity for institutionalization. It has come to the attention of the commit-

---

**27.** *See* note 38, *infra.*

**28.** As noted above, *supra,* the trial court did not reach the question of liability under § 6001 and while it found liability under § 504, the court did not rely expressly on that statute in

developing a least restrictive alternative analysis. Since we also do not rely on § 504 or on the Constitution for our holding, we have, of necessity, departed somewhat from the trial court's approach.

tee that there needs to be particular attention paid to the same basic problem as it applies to the developmentally disabled. There seems to be a tendency in some areas to resort to inpatient treatment when other means of accomplishing the treatment might be possible. Having recognized that this misuse of facilities has taken place, it is now necessary that we take steps to review and correct the mistakes already made. The bill [H.R. 4005] requires that States spend a specified percentage of allotments to tackle the problem and see that those who have been inappropriately institutionalized be handled in some other manner.

*Id.* at 9977. Congressman Biaggi noted that "[t]he bill . . . recognizes the trend toward deinstitutionalization and propose[s] increased appropriations to carry out demonstration programs which will affect [sic] this goal." *Id.* at 9978. He added that "the cost of home health care can be . . . up to five times less expensive than care in a specialized facility." *Id.*

The House version of the bill passed by a vote of 398–5. *Id.* at 9981–82. As noted above, it was introduced in the Senate as S. 462. *Id.* at 16,470. Senator Williams, supporting the bill, described in detail the abuses of institutionalization to which the measure was addressed.

Over the past few years, the horrifying conditions which exist in most of the public residential institutions for the mentally retarded and other developmentally disabled persons have provided shocking testimony to the inhuman way we care for such persons. The conditions at Willowbrook, at Partlow in Alabama, and at Rosewood in Maryland, and at many other institutions have shown beyond a shadow of a doubt that the treatment of these individuals is worse then [sic] all of us would like to admit.

Steps to scale down many of these large custodial institutions have resulted in not-so-large institutions, often with not much improved care and with little follow-up. This has been true at Willowbrook: in 1965 and again in 1972, broad criticism has been levied at this institu-

tion; all indications point toward little change, unless substantial legal and advocacy pressure is forthcoming. While much can be said about the lack of available funds to improve conditions at these institutions, at some point this country must draw the line. The abuses are too commonplace to point at a single institution, or a single abuse and say that it is an anomaly. Over the last 2 years the Committee on Labor and Public Welfare has taken testimony or received reports of: Inappropriate admissions because of lack of community services, inappropriate and inhuman experimentation with residents, sterilizations and other operations performed for convenience of treatment, starvation and malnutrition, abuse and physical punishment, inadequate food and living conditions, and death.

S. 462 provides a framework by which the constitutional rights of residents and other persons with developmental disabilities may be enforced.

*Id.* at 16,516–17. Senator Kennedy echoed these sentiments.

Last year in testimony on this legislation, Geraldo Rivera showed the committee portions of his documentary on Willowbrook, and if anyone needed convincing of the need for the establishment of institutional standards, that film provided it. This legislation provides for the establishment of such standards.

*Id.* at 16,517. So, too, did Senator Cranston, *id.* at 16,520 ("I believe one very clear basic goal has been enunciated in the legislation reported from committee. That is the need to move away from long-term institutionalization of individuals with developmental disabilities to the development of community-based programs utilizing all community resources related to treatment or habilitation of such individuals to provide comprehensive services in the home community."); Senator Schweiker, *id.* at 16,521 ("The last 5 years have seen a dramatic increase in public awareness of the needs of institutionalized mentally retarded and developmentally disabled persons. This has been highlighted by scandals in many institutions, by court

cases, and by the efforts of the communications media. Testimony before the committee demonstrated that standards in institutions for the developmentally disabled are urgently needed and that the Federal Government should play a major role in improving the care and services provided to developmentally disabled citizens."); and Senator Beall, *id.* at 16,522 ("In addition, I would like to express my support of title II of this bill, which reflects the increasing concern of Congress and the public in general about persons who are institutionalized because they are developmentally disabled. Increased technological development, especially in regard to travel speeds, and the sociological stress that many of our citizens are experiencing, particularly in this time of economic strain and increased crime, evidence the sad fact that there will be an increased need for psychological care. Residential care outside the home is necessary in some instances, although I am glad to say that increased emphasis is being placed on similar community-based facilities rather than the larger State institutions. Title II assures those individuals who must be institutionalized of their civil and personal rights, and, at the same time, provides for the best possible care and services.")

The Senate substituted the text of S. 462 for the House bill, H.R. 4005, and passed it. *Id.* at 16,523. A conference was convened and as noted above, the Senate's expansive delineation of the standards for institutional and community care was dropped and a more general Bill of Rights (section 6010) was adopted. Nevertheless, the Congress was serious about the Bill of Rights. The Conference Report noted the difference between the Senate and House versions of the Act, and explained the resulting compromise:

*Statement of Purpose*

The Senate amendment, but not the House bill, states the purpose of the bill of rights to be establishing standards to assure the humane care, treatment, habilitation and protection of mentally retarded and other developmentally disabled individuals who are served by residential and community facilities and agencies.

The conference substitute contains a compromise which enumerates Congressional findings respecting the rights of persons with developmental disabilities. These include findings that the developmentally disabled have a right to appropriate treatment, services and habilitation; that such treatment, services and habilitation should be designed to maximize the developmental potential of the person and be provided *in the setting that is least restrictive to his personal liberty;* that the Federal government and the States have an obligation to assure that public funds are not provided in programs which do not provide appropriate treatment, services and habilitation or do not meet minimum standards respecting diet, medical and dental services, use of restraints, visiting hours and compliance with fire and safety codes; and that programs for the developmentally disabled should meet appropriate standards including standards adjusted for the size of the institutions which are at least comparable to those promulgated under title 19 of the Social Security Act. (emphasis added).

H.R.Conf.Rep.No. 94–473, 41–42 (1975) *reprinted in* [1975] U.S.Code Cong. & Ad. News, 943, 961.

When the Conference Report was submitted to the Senate, the new version of Title II (the Bill of Rights) was specifically reprinted so as "to emphasize the importance of this title of the bill." 121 Cong. Rec. 29,819 (1975) (remarks of Sen. Stafford). Senators Javits, Schweiker, and Williams all called attention to the Bill of Rights in applauding the compromise measure. *Id.* at 29,820–21.

Yet, while it disfavored institutionalization, the Developmentally Disabled Assistance and Bill of Rights Act did not prohibit all institutions. Congressman Carter, introducing H.R. 4005, stated "[t]his legislation also directs that States should devote attention to improving the facilities and surroundings of institutions where people have been appropriately institutionalized." *Id.* at 9976. Senator Stafford reported that

"Title II was added to the bill to assist in the protection of the rights guaranteed under our Constitution for those individuals that will require institutionalization . . ." *Id.* at 16,516. And Senator Cranston observed that "in encouraging the movement to community-based programs, I recognize that the need for some long-term residential programs will remain. The bill specifically provides that where institutional programs are appropriate, adequate support should be planned for them so that necessary treatment and habilitation programs can be given residential patients to develop their full potential." *Id.* at 16,520. These same points were reflected in the Conference Report. Explaining the Bill of Rights provisions, the Report stated:

These rights are generally included in the conference substitute in recognition by the conferees that the developmentally disabled, particularly those who have the misfortune to require institutionalization, have a right to receive appropriate treatment for the conditions for which they are institutionalized, and that this right should be protected and assured by the Congress and the courts.

H.R.Conf.Rep.No. 94–473, 42 (1975) *reprinted in* [1975] U.S.Code Cong. & Ad.News, 943, 961.

The Act does not, therefore, articulate a *per se* rule prohibiting institutions. That was not how the Congress understood the right to the least restrictive alternative. Rather, it seems that Congress believed that, for some patients, institutionalization might be "appropriate." In those individual cases, probably comparatively rare, adequate habilitation could not be accomplished in any setting less restrictive than an institution and the need for such habilitation could thereby justify institutionalization.

It is argued, however, that because the Act, until 1978, required states to spend a specific minimum amount for deinstitutionalization, the states were free to use institutions as much as they chose so long as they spent the specified amounts on alternative facilities. According to this thesis, states might retain full or nearly full institutionalization even for those patients for whom institutionalization was not "appropriate." We do not accept this contention. The spending requirement was clearly intended to encourage the development of alternative facilities. Congress rightly believed that the states were doing too little to develop alternatives to institutions. The minimum expenditure requirement must not be confused with a maximum duty on the states' parts; to do so would substantially undermine the rights articulated in section 6010 and the insistence on specific deinstitutionalization plans in section 6063.

We hold, therefore, that the Developmentally Disabled Assistance and Bill of Rights Act provides to mentally retarded persons the right to the least restrictive environment. For some patients, to be sure, the Act contemplates that institutionalization might be appropriate once adequate habilitation and living conditions are established. The clear preference of the Act, however, is deinstitutionalization, and for the reasons set forth in Part V A, we have no doubt about Congressional power to impose the least restrictive alternative requirement upon the states for patients who do not require institutionalization for adequate habilitation.

B. *Section 504 of the Rehabilitation Act of 1973*

Appellees argue that section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976), also reflects Congressional desire to discourage the institutionalization of the mentally handicapped.[29]

29. Section 504 provides

No otherwise qualified handicapped individual in the United States, . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794 (1976).

Section 504 is the final section of the Rehabilitation Act of 1973. Textually, section 504 parallels the language of section 601 of Title VI of

While its language is somewhat opaque, appellees argue that the illuminating legislative history of section 504 supports the view that Congress sought in that section to combat, to the extent appropriate, the isolation of the handicapped from the community—an isolation which it believed was ineluctably entailed by institutionalization.[30] Thus section 504, appellees argue, provides an alternative statutory basis for enforcing the right to a least restrictive environment or that the legislative history of section 504 offers powerful corroboration for the deinstitutionalist purposes of the Developmentally Disabled Assistance and Bill of Rights Act. However, because we have found clear expression of a least restrictive alternative requirement in the Developmentally Disabled Assistance and Bill of Rights Act, and ample confirmation of that expression in its legislative history, we find it unnecessary to consider these arguments. One clear federal statute announces the governing rule, and one is enough. Thus we decline to consider section 504 issues on this appeal.

## VII. RELIEF

We have thus far concluded that the mentally retarded patients at Pennhurst have federal and state protected rights to habilitation in the least restrictive environment. Moreover, it goes almost without saying that Pennhurst, as it was constituted and operated at the time of the lawsuit, was in flagrant violation of those rights. The conditions at Pennhurst were unsanitary, programming was nonexistent, enforced idleness was substituted for meaningful habilitation, physical and chemical restraints were wantonly applied, and overcrowding and understaffing were the prevailing institutional norms. Yet, appellants contend that even if they were properly found liable under federal and state law, the trial court nevertheless erred in several respects in ordering the relief that it did. First, they argue, the court order violates the eleventh amendment insofar as its effectuation will require an allocation of funds from the state treasury. Second, they urge, the relief should not have been classwide since events have disclosed a material rupture within the affected class. Third appellants protest the appointment of a special master as beyond the scope of Rule 53(b), Fed.R.Civ.P. 53(b). Finally, they contend, several specific portions of the court order are legally unsupportable. These include: the requirement that patients and/or their next friend participate in the structuring of relief and review of the plan; the requirement that certain local rules on physical and chemical restraints be implemented; the requirement that a "friend-advocate" system be established; the requirement that alternate employment for each Pennhurst employee be found; and the requirement that Pennhurst be closed entirely and community living arrangements established in its place. While most of these objections are insubstantial, we do agree that the ordered relief is somewhat overbroad. Accordingly, the injunction will be modified in accordance with our discussion below.

the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1976), and of section 901 of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 (1976). Its passage was the result of a long effort to obtain for the handicapped a civil rights act similar to section 601 and section 901.

**30.** *See* 118 Cong.Rec. 525 (1972) (remarks of Sen. Humphrey) (anti-isolation purposes of proposed amendment to § 601, predecessor to § 504); H.R. 8395, 92d Cong., 2d Sess. (1972) (Rehabilitation Act of 1972, predecessor bill of Rehabilitation Act of 1973); 118 Cong.Rec. 32,-280 (1972) (remarks of Sen. Cranston) (anti-discrimination and anti-isolation purposes of Act); *id.* at 32,310 (remarks of Sen. Humphrey) (same); *id.* at 35,163 (anti-discrimination provision accepted by House in conference); *id.* at 36,410 (remarks of Rep. Brademas) (opposing isolation of handicapped due to institutionalization); *id.* at 36,414 (remarks of Rep. Badillo) (same); *id.* at 37,203–04 (Rehabilitation Act of 1972 vetoed by Pres. Nixon). The bill was reintroduced as the Rehabilitation Act of 1973, S. 7, 93d Cong., 1st Sess. (1973), and section 504 was finally enacted as part of this Act, with its proponents again emphasizing anti-isolation principles. *See* 119 Cong.Rec. 5880 (1973) (remarks of Sen. Cranston); *id.* at 5887 (remarks of Sen. Javits); *id.* at 18,127 (remarks of Rep. Brademas); *id.* at 24,566 (remarks of Sen. Stafford).

## A. *The Eleventh Amendment*

■ The Commonwealth defendants assail the decree as a violation of the eleventh amendment. They urge that although the decree is couched in terms of prospective injunctive relief, its effectuation will nevertheless require the expenditure of Commonwealth funds. This result, it is urged, is forbidden by *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Yet *Edelman* specifically acknowledges the continued availability of prospective injunctive relief even though such relief realistically does impose financial burdens. 415 U.S. at 667–68, 94 S.Ct. 1347. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 459–60, 96 S.Ct. 2666, 49 L.Ed.2d 614 (Stevens, J., concurring). All of the relief ordered here is prospective. We have told the Commonwealth before that *Edelman* "quite explicitly left intact the authority of federal courts to enter prospective decrees having fiscal consequences to a state treasury as the necessary result of compliance." *Vecchione v. Wohlgemuth*, 558 F.2d 150, 158 (3d Cir.), *cert. denied*, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977). We have not changed our minds on that question.

We note, in addition, that the Supreme Court has recently reaffirmed this position. In *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) the Court held that it was not a violation of the eleventh amendment for a federal court to order state officials to send an explanatory notice to members of a class advising them that there are state administrative procedures available by which they may receive a determination of whether they are entitled to past welfare benefits. The mere fact that such notices might eventually lead to an expenditure of funds by the state did not alter the fact that the relief was "properly viewed as ancillary to the prospective relief already ordered by the court." 440 U.S. at 349, 99 S.Ct. at 1149.

We therefore reject appellants' eleventh amendment objections.

## B. *Classwide Relief*

■ On April 13, 1978, a motion to intervene in order to protest the possible closing of Pennhurst was filed on behalf of the Pennhurst Parents-Staff Association and six Pennhurst residents. That motion, which was made after the Commonwealth and Philadelphia defendants had filed their notices of appeal, was denied, and the appeal from that denial is considered separately at No. 78–1999. In their appeal in this case, the Commonwealth defendants rely on that motion to intervene as evidence that the interests of the plaintiffs were adverse to one another, and thus that the trial court erred, first, in certifying the class, and second, in granting classwide relief. We reject completely the first contention. The certification of the class for purposes of determining liability was entirely proper. Plainly, the violations of federal and state law which the trial court found and which we have affirmed, are violations affecting all of the plaintiffs, not simply those who wish a transfer from Pennhurst. At the liability stage, therefore, important questions of law were common to all members of the class. Thus, regardless of any subsequent disagreement among class members as to the appropriate relief, we can think of no persuasive reason to have fractionated the class at that early juncture. *See* Fed.R.Civ.P. 23(c)(4)(A) (permitting use of class action device for purposes of particular issues within lawsuit). As Judge Frankel observed in the context of class actions brought under Rule 23(b)(3), Fed.R. Civ.P. 23(b)(3):

> In the cases to which I refer, assertedly under (b)(3)—i. e., having both common issues and issues affecting separately the individual members of the class—district judges have apparently thought that all members of the class would have to be brought before the court—for discovery as well as trial—before there could be any judgment affecting the class as a whole. Insofar as this premise lurks in the cited cases, it would appear to be unwarranted. Take, for example, the simple model of the case by an alleged class of securities purchasers charging fraudulent representations. There are,

supposedly, common questions as to the nature of the alleged representations, falsity, and materiality. If some or all such questions are decided against the plaintiff class, the complaint will be dismissed and, always assuming adequate representation of the class, there will be a judgment binding the class without requiring any but the representative members to have been before the court.

On the other hand, if the plaintiff class prevails on the common questions, it will then—but only then—become necessary to try or settle or otherwise dispose of individual questions like reliance, damages, or the like. If the common questions have been aptly defined, there should be no need at an earlier stage to have all the individual class members before the court for discovery or any other purpose.

Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 47 (1967) (footnote omitted). *See also Developments in the Law—Class Actions*, 89 Harv.L.Rev. 1318, 1491–92 (1976). It was not abuse of the trial court's discretion to certify the class for purposes of determining liability.[31]

■ The Commonwealth contends, however, that because some members of the plaintiff class are opposed to the closing of Pennhurst, the class should at least have been decertified for purposes of relief. Thus, it argues that classwide relief infringes on the dissenting members' rights. As we indicate in more detail below, the trial court did err in promulgating a blanket order closing Pennhurst without sufficiently canvassing the needs of individual patients. Accordingly, inasmuch as we modify the court order appealed from, our opinion takes account of the differences within the class concerning relief. Nevertheless, we do not think that the implementation of the relief, as modified by our opinion, requires the decertification of the class. Two procedural alternatives, short of decertification, are available to the trial

court on remand in implementing individuated relief.

First, the court can create subclasses within the plaintiff class pursuant to Rule 23(c)(4)(B). Through this process, individual patients who wish to remain at Pennhurst may be represented at the implementation hearings. We suggested this approach in *Samuel v. University of Pittsburgh*, 538 F.2d 991 (3d Cir. 1976) (Clark, J.). There, we reversed a trial court decision decertifying a class at the relief stage. We stated that "even if there were managerial difficulties [in litigating the appropriate relief], some investigation into the possible usefulness of subclasses as suggested by Rule 23(c)(4)(B) should have been undertaken before decertification was ordered." 538 F.2d at 996. *See also Nix v. Grand Lodge of Int'l. Ass'n of Mach. & Aero. Workers*, 479 F.2d 382, 385 (5th Cir.), *cert. denied*, 414 U.S. 1024, 94 S.Ct. 449, 38 L.Ed.2d 316 (1973); *Developments in the Law—Class Actions*, 89 Harv.L.Rev. 1318, 1479–82 (1976).

Yet another means by which dissenting members may be represented at the relief stage is through intervention. *See id.* at 1482–85. We note in this connection that the trial court currently has under consideration a motion by the Pennhurst Parents-Staff Association—who purport to represent patients opposed to closing Pennhurst—to intervene at the relief stage.

Even should the trial court ultimately decline to pursue either of these two procedural alternatives to decertification, the interests of dissenting members will still be represented. As we suggested above, and as we will elaborate at greater length below, plaintiffs' right to habilitation in the least restrictive environment requires that they be given an individual opportunity to participate in the process by which their habilitation is chosen. Thus, whether they are represented as a group, through such procedural safeguards as subclasses or intervention, or whether they participate as individuals, class members who wish contin-

---

31. *See Paton v. La Prade*, 524 F.2d 862, 875 (3d Cir. 1975); *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 245 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

ued habilitation at Pennhurst will have a chance to state their position.

### C. The Use of a Master

The court found that implementation of its order would be impossible without the assistance of a Special Master "with the power and duty to plan, organize, direct, supervise and monitor the implementation of this and any further Orders . . ." 446 F.Supp. at 1326. It directed the Commonwealth and County defendants to provide the Master with access to premises, records, documents, and residents, and to cooperate with him to the extent necessary to execute such orders. The Master was directed to prepare and present to the court for its approval various plans for the transfer of Pennhurst residents to CLAs and for the provision of services to the class members "in the least separate, most integrated, least restrictive community setting," taking into account available resources. Id. at 1326–27. The order also directed that the Master prepare a plan for the interim operation of Pennhurst pending its replacement by other living arrangements and services.

The appellants contend that appointment of a master was improper under Rule 53(b), Fed.R.Civ.P. 53(b). We disagree. It is abundantly clear that providing the 1200 Pennhurst residents with a right to habilitation in the least restrictive environment will be a complex and lengthy process, probably involving monitoring, dispute resolution, and development of detailed enforcement mechanisms. Were we to preclude the trial court from resorting to a master, we would help make self-fulfilling the frequently made prophecy that courts are institutionally incapable of remedying wholesale violations of legally protected rights. Masters have been used in a wide variety of remedial contexts. These include cases involving handicapped children,[32] as well as cases remedying various other statutory or constitutional violations.[33] Masters are peculiarly appropriate in the implementation of complex equitable decrees which require ongoing judicial supervision.[34]

Moreover, by use of a master, the judge can minimize his personal participation in the details of implementation without sacrificing direct control or efficacy.[35]

While they acknowledge that courts have frequently relied upon special masters, appellants nonetheless insist that the Master appointed by the trial court in this case will have excessive powers. "The proper role of a master in federal litigation," appellants urge, "is narrowly circumscribed." Brief for Commonwealth Appellant at 49. Specifically, it is urged, a master may only find facts. Since the lower court has already found the facts, any use of a master for implementation purposes intrudes excessively into the proper domain of local autonomy. Id. at 51–52.

This argument is unpersuasive. First, the Commonwealth is simply incorrect in asserting that the scope of a master's duties is narrow. As one commentator has properly noted, "[m]asters may be delegated the

---

**32.** See, e. g., Mills v. Board of Educ., 348 F.Supp. 866 (D.D.C.1972); Pennsylvania Ass'n for Retarded Children (PARC) v. Pennsylvania, 334 F.Supp. 1257 (E.D.Pa.1971), 343 F.Supp. 279 (E.D.Pa.1972).

**33.** See, e. g., Chicago Hous. Auth. v. Austin, 511 F.2d 82 (7th Cir. 1975) (overseeing implementation in public housing discrimination case); Gautreux v. Chicago Hous. Auth., 384 F.Supp. 37 (N.D.Ill.1974) (same); Hart v. Community Sch. Bd., 383 F.Supp. 699 (E.D.N.Y. 1974), aff'd, 512 F.2d 37 (2d Cir. 1975) (coordinating development of desegregation plan in housing and school discrimination case); Moore v. Leflore County Bd. of Election Comm'rs, 361 F.Supp. 603 (N.D.Miss.1972) (formulating reapportionment plan); Gates v.

Collier, 349 F.Supp. 881 (N.D.Miss.1972) (implementing prison reform), aff'd, 501 F.2d 1291 (5th Cir. 1974); Knight v. Board of Educ., 48 F.R.D. 115 (E.D.N.Y.1969) (conducting due process grievance hearings in schools).

**34.** See generally Note, Implementation Problems in Institutional Reform Litigation, 91 Harv.L.Rev. 428 (1977); Note, Monitors: A New Equitable Remedy?, 70 Yale L.J. 103 (1960).

**35.** Note, Implementation Problems in Institutional Reform Litigation, 91 Harv.L.Rev. 428, 451 (1977); Kaufman, Masters in the Federal Courts: Rule 53, 58 Colum.L.Rev. 452, 469 (1958).

authority to issue subpoenas, hear grievances, take sworn testimony, and make formal or binding recommendations, including contempt findings, to the court." Note, *Implementation Problems in Institutional Reform Litigation,* 91 Harv.L.Rev. 428, 451 (1977). In employment discrimination cases, for example, court-appointed administrators, who have the same powers as masters, have made frequent and successful use of rather wide-ranging powers. *See* Harris, *The Title VII Administrator: A Case Study in Judicial Flexibility,* 60 Cornell L.Rev. 53 (1974). Authorized to take all action necessary to implement the decree and to remedy breaches of compliance, these administrators have performed negotiating and investigatory functions, and have issued recommendations for future implementation. *Id.* at 55, 64. *See* Note, *Implementation Problems in Institutional Reform Litigation,* 91 Harv.L.Rev. 428, 452 (1977).

In this case, moreover, the court's resort to use of a master is particularly appropriate. After the decision on liability was announced, the appellants were afforded an opportunity to devise and present their own remedies for conditions at Pennhurst. They failed to do so. At that point, having received insufficient assistance from the officials directly involved, the court was faced with the choice of massive personal participation in devising a complex scheme for remedying the violations that were found, or of proceeding with the assistance of a master, whose functions would be supplementary to and supervisory over those of the Commonwealth and County defendants. We hold that the trial court chose correctly in ordering the appointment of a master. We are confident that the court will exercise appropriate supervision over the operations of the Master in order to minimize the expenditure of funds in the administration of his responsibilities and the manner in which he discharges his responsibilities under the decree—in particular, the manner in which individualized habilitation programs are developed for each class member. As we understand the role of the Master under the decree, he is to supervise all implemen-

tation efforts with the aid and assistance of all parties to the lawsuit. The defendants will thus have an opportunity to participate in the structuring of relief. Moreover, their underlying obligation to provide habilitation in the least restrictive environment is derived, in part, from a state statute and federal statutes under which Pennsylvania has received federal funds. These duties were known and consented to. These considerations, in our view, vitiate whatever complaint the Commonwealth might otherwise have that the court order somehow violates whatever principles of federalism are relevant. Brief for Appellant at 59–62.

**D. *Specific Objections to the Court Order***

Appellants also contest certain specific portions of the court's decree. They object to paragraph 2, 446 F.Supp. at 1326, which entitles members of the class and their next friend to participate in the development and review of the plan. They protest that paragraph 13, *id.* at 1328, requiring that certain local rules on physical and chemical restraints be implemented, is inapplicable since (1) the rules were not in effect long enough to permit a finding that they were violated, and (2) the rules are not statutorily compelled. In addition, appellants contend that paragraph 6, *id.* at 1326–27, imposes on the state duties which have no legal source; these duties include the establishment of a friend-advocate system and the provision of alternative employment for each Pennhurst employee. Finally, appellants argue that the trial court should not have ordered that Pennhurst be entirely closed, particularly in view of the apparent desire of certain members of the class to remain at the institution once it is improved.

Criteria for evaluating the trial court's exercise of discretion in effecting a remedy are set forth in *Milliken v. Bradley,* 433 U.S. 267, 279–288, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Milliken II*). There, the Court held that if an alleged injury is constitutionally (or presumably statutorily) cognizable, "the remedy does not 'exceed' the violation if the

remedy is tailored to cure the ' "condition that offends the Constitution." ' " *Id.* at 282, 97 S.Ct. at 2758 (quoting *Milliken v. Bradley,* 418 U.S. 717, 738, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (*Milliken I*)) (emphasis added by the *Milliken II* Court). In *Milliken II,* the Court affirmed a district court decision to order certain remedial reading, testing, and counseling services. These remedies, the Court concluded, were found by the trial court to be necessary to "cure" the "condition" of *de jure* segregation in Detroit. *Id.* at 288, 97 S.Ct. 2749. The Supreme Court could find no reason to believe that the district court had abused its "broad and flexible equity powers" in reaching this determination. *Id.*

Under these liberal standards, we have no trouble upholding paragraphs 2 and 13 of the court order. In this case, the "condition" to be "cured" is the failure to provide the retarded with adequate habilitation in the least restrictive environment. Both paragraphs 2 and 13 are directly addressed to remedying this condition. Parental and patient participation in the design of alternative facilities is well-suited to redressing the violations of the rights of the retarded. So, too, are the restrictions imposed by the court against physical and chemical restraints.

In addition, we affirm that portion of paragraph 6 which establishes a friend-advocate system to monitor the continued availability of community services to the retarded. Not only will such a system help to effectuate the rights of the retarded but, by providing ongoing supervision of implementation efforts, it will reduce the need for judicial oversight.

The court's decree should be modified in two respects. First, we cannot agree with that portion of paragraph 6 requiring that alternative employment be provided to all Pennhurst employees. Even under the liberal standards of *Milliken II,* we do not see how this mandate is reasonably related to facilitating the right of the retarded to habilitation in the least restrictive environment. This section of the court's order must therefore be set aside.

Second, we cannot agree with the trial court that Pennhurst must be entirely closed. In so ruling, the court first noted that Pennhurst was not providing adequate habilitation at the time of the litigation. 446 F.Supp. at 1318. With that conclusion we obviously agree. But the court also held that Pennhurst could *never* provide adequate habilitation because of its very status as a large institution.

> [O]n the basis of this record we find that minimally adequate habilitation cannot be provided in an institution such as Pennhurst. As the Court has heretofore found, Pennhurst does not provide an atmosphere conducive to normalization which is so vital to the retarded if they are to be given the opportunity to acquire, maintain and improve their life skills. Pennhurst provides confinement and isolation, the antithesis of habilitation. We found that Pennhurst has produced regression and in many instances has destroyed life skills possessed by its retarded residents at the time of their admission. We are inclined to agree with the following comments of Mason & Menolascino, . . . (footnotes omitted):
>
> > Although *Wyatt* and *Welsh* are significant in their recognition of the principles of normalization and the developmental model for the factual foundation of their formulation of the constitutional right to habilitation, their approach can be considered only the rudimentary beginning. The logic of normalization and the developmental model which *Wyatt* and *Welsh* recognized suggests full implementation of habilitation can only be achieved in a non-institutional setting. Institutions, by their very structure—a closed and segregated society founded on obsolete custodial models—can rarely normalize and habilitate the mentally retarded citizen to the extent of community programs created and modeled upon the normalization and developmental approach components of habilitation. Neither *Wyatt* nor *Welsh* fully imple-

mented the right to habilitation in that they failed to challenge the very existence of the institution. Consequently, the two institutional characteristics most antithetical to the application of the normalization principle remain intact: segregation from the community and the total sheltering of retarded citizens in all spheres of their lives. *Id.* (footnote omitted) (quoting Mason & Menolascino, *The Right to Treatment for Mentally Retarded Citizens: An Evolving Legal and Scientific Interface*, 10 Creighton L.Rev. 124, 156–57 (1976)). The court was thus apparently persuaded to the view, shared by many practitioners, that institutionalization of any sort is a deterrent to adequate habilitation.[36]

It is probably true, as the trial court found, that in general institutions are less effective than community living arrangements in facilitating the right to habilitation in the least restrictive setting. There is ample testimony on the record indicating the shortcomings of institutions as places for habilitation. *See, e. g.*, Record, vol. 1, at 96 (testimony of Dr. Roos); Record, vol. 4, at 73 (testimony of Mr. Lancaster-Gaye); Record, vol. 2, at 96 (testimony of Dr. Clements). Moreover, institutions would generally appear not to be the least restrictive environment in which to provide habilitation. *See* Record, vol. 4, at 79 (testimony of Mr. Lancaster-Gaye); Record, vol. 2, at 85 (testimony of Dr. Clements); Record, vol. 1, at 179 (testimony of Dr. Roos). Thus we cannot find clearly erroneous the trial court's determination that, for the retarded class members as a whole, Pennhurst cannot be an appropriate setting in which to provide habilitation.

But in making this wholesale judgment, the trial court did not adequately canvass the discrete needs of *individual* patients. For some patients a transfer from Pennhurst might be too unsettling a move.

Longterm patients, for example, may have suffered such degeneration in the minimum skills needed for community living that habilitation outside an institution is a practical impossibility. Indeed, the Pennhurst Parents-Staff Association, which has participated as an amicus in this appeal, contends that this is true for many patients. Moreover, there seems to be some support among practitioners for this view as well.[37] We need not decide that issue here. All that we need recognize is that there may be some individual patients who, because of advanced age, profound degree of retardation, special needs or for some other reason, will not be able to adjust to life outside of an institution and thus will be harmed by such a change. The case must therefore be remanded for individual determinations by the court, or by the Special Master, as to the appropriateness of an improved Pennhurst for each such patient.

■ We base our ruling on the *nature* of the rights being enforced in this case. The framers of 42 U.S.C. §§ 6001–6081, as we have noted, did not anticipate a shutdown of all institutions when they endorsed a right to habilitation in the least restrictive environment. Rather, they recognized that for some patients institutions, once improved, might be appropriate. Similarly, we do not think that the Pennsylvania legislature, in providing a right to treatment in the Mental Health and Mental Retardation Act of 1966, intended to foreclose all institutionalization. In section 102 of that Act, for example, the legislature expressly included "institution[s]" within the category of "facilities" for which the Department of Public Welfare was responsible. Pa.Stat. Ann. tit. 50, § 4102. Thus, we see in the MH/MR Act of 1966 exactly the intent ascribed to it by Senator Pechan when he spoke in support of the measure.

The object of this legislation is to make it possible for every mentally disabled per-

---

36. *See, e. g.*, Burt, *Beyond the Right to Habilitation*, in *The Mentally Retarded Citizen and the Law* 418–36 (President's Committee on Mental Retardation, 1976).

37. *See e. g.*, Clements, *Reaction Comment*, in *The Mentally Retarded Citizen and the Law* 437 (President's Committee on Mental Retardation, 1976); M. Rosen, G. Clark, & M. Kivitz, *Habilitation of the Handicapped* 101–11 (1977).

son to receive the kind of treatment he needs, when and where he needs it. 1966 Pa.Legis.J., 3d Spec.Secc., No. 33, 76 (Sept. 27, 1966). The state statute, like the federal statute, was focused on *individual* needs. Since the statutory rights to treatment, state and federal, vindicate the individual patient's fundamental interest in personal liberty, it is only fitting that the Commonwealth be required to undertake a case-by-case investigation into how each person's rights may best be facilitated.

The right to the least restrictive environment also supports an individualized approach. Insofar as the right derives from sections 6001–6081, it is plain that no *per se* rule against institutions was contemplated. Moreover, although we do not predicate our holding on a constitutional right to treatment in the least restrictive setting, we note that such a constitutional right would protect the liberty interest of *individuals.* It would be anomalous to recognize the right to the least restrictive environment but never inquire whether a given individual can adjust to the environment to which he has been consigned. Thus to the extent that the district court predicated its blanket prohibition against institutionalization in Pennhurst on the fourteenth amendment, we disagree. Whatever the Constitution *requires* by way of least restrictive alternatives, it does not *preclude* resort to institutionalization of patients for whom life in an institution has been found to be the least restrictive environment in which they can survive.

Of course, deinstitutionalization is the favored approach to habilitation. The federal statutory material makes that clear and we acknowledge that constitutional law developments incline in that direction as well.[38] Thus, on remand, the court or the Master should engage a presumption in favor of placing individuals in CLAs. But the special needs and desires of individual patients must not be neglected in the process.

█ Finally, consideration must be given to the order directed to the future activity of the Base Service Units. That order essentially imposes an absolute ban on admissions to Pennhurst, paragraphs 9, 10, 446 F.Supp. at 1327, and requires that the defendants provide CLAs for all persons on the Pennhurst waiting list, *id.* at 1326, paragraph 1.

As we have noted with respect to current residents of Pennhurst, the court or the Master should engage in a presumption that individuals should be placed in CLAs. This presumption is equally important, if not more so, with respect to applicants for future admission. However, we have recognized that although institutionalization is strongly disfavored, it is not foreclosed completely by the governing federal and state statutes. It is conceivable that in processing a given future application, a Base Service Unit will find that no available CLA is suitable for the individual, life in the community is not possible, and no other

**38.** *See, e. g., Parham v. J. L.,* 442 U.S. 584, 99 S.Ct. 2493, 2502–03, 61 L.Ed.2d 101 (1979); *Secretary of Public Welfare of Pennsylvania v. Institutionalized Juveniles,* 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (U.S.1979); *O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Welsch v. Likins,* 550 F.2d 1122, 1125–26 (8th Cir. 1977), *affirming in relevant part, vacating and remanding in part,* 373 F.Supp. 487 (D.Minn. 1974); *Lake v. Cameron,* 124 U.S.App.D.C. 264, 270, 364 F.2d 657, 663 (D.C.Cir.1966) (en banc); *Evans v. Washington,* 459 F.Supp. 483, 484 (D.D.C.1978) (by consent decree); *Eubanks v. Clarke,* 434 F.Supp. 1022, 1027–28 (E.D.Pa. 1977); *Gary W. v. State of Louisiana,* 437 F.Supp. 1209 (E.D.La.1976); *Suzuki v. Quisenberry,* 411 F.Supp. 1113, 1132–33 (D.Hawaii 1976); *Lynch v. Baxley,* 386 F.Supp. 378, 392 (M.D.Ala.1974) (three judge court); *Davis v. Watkins,* 384 F.Supp. 1196, 1203, 1206 (N.D. Ohio 1974) (by stipulation); *Saville v. Treadway,* 404 F.Supp. 430, 433 (M.D.Tenn.1974) (by stipulation); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972), *vacated and remanded for a more specific order,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661, *order on remand,* 379 F.Supp. 1376 (E.D.Wis.1974), *vacated and remanded on other grounds,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *order reinstated on remand,* 413 F.Supp. 1318 (E.D.Wis. 1976); *Wyatt v. Stickney,* 344 F.Supp. 373 (M.D.Ala.1972), 344 F.Supp. 387 (M.D.Ala. 1972), *enforcing* 325 F.Supp. 781 (M.D.Ala. 1971), *affirmed in relevant part, remanded in part, and decision reserved in part, Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974).

alternative institution in the relevant geographic area is available. Modification of the decree to permit admission to Pennhurst of such an individual while it remains open, but under court supervision as in the case of present residents, seems appropriate. This would provide for the interim accommodation of such persons while, as the decree contemplates, and the Commonwealth intends, Pennhurst is being phased out. We emphasize again, however, that any determination with respect to future applicants must always be made with the least restrictive alternative in mind and that the modification is appropriate only because an extreme situation calling for institutionalization might arise. The precise mechanism for court supervision of the Base Service Units in this regard we leave to the district court.

Naturally, nothing we have said here should be understood to disapprove the interim measures ordered by the trial court for the improvement of Pennhurst. Quite the reverse: state and federal laws plainly require that if Pennhurst is to remain open for at least some patients, it must be dramatically improved so as to provide adequate habilitation. Neither should our willingness to permit retention of Pennhurst as an institution available for those who cannot be treated in any less restrictive environment be construed as an invitation to the appellants to desist from opening up alternative community facilities. As we have said, institutionalization is a disfavored approach to habilitation. Only where the court or the Master finds that an improved Pennhurst is the only appropriate place for individual patients should it be used. For all other patients, CLAs must be provided.[39] We caution both the trial court and the Master that before ordering transfers to CLAs they must have assurances that the sanitary, staffings, and program deficiencies which were found at Pennhurst are not duplicated on a smaller scale in the CLAs. If staffing and programs are inade-

quate at the CLAs, then the goals of deinstitutionalization will not be met. Mere changes in the size of buildings and their location are not enough to meet the statutory requirements.

There are six other appeals pending in this court from orders entered subsequent to the March 17, 1978 order with which this opinion deals. By agreement of the parties, briefing has been postponed in these appeals pending disposition of this appeal. On remand, the district court should be free, despite the pendency of the appeals, to consider modification of the orders with which these appeals are concerned, in the light of the modification of the March 17, 1978 order that we have directed. Because the district court is free to consider modification of the orders subsequent to March 17, 1978, the motions for stays of those orders are denied without prejudice.

## VIII. *CONCLUSION*

With the exception of the order to find alternative employment for all Pennhurst employees, the order directing the eventual closing of Pennhurst, and the order banning all future admissions to Pennhurst, the judgment of the trial court will be affirmed in all respects. To facilitate the inquiry into the appropriate setting for each patient's habilitation, the court may, if it chooses, permit particular organizations to intervene at the relief stage or create subclasses. Alternatively, it may allow the inquiry to proceed on a case-by-case basis. No matter how it is accomplished, however, an assessment of each class member's needs must be carried out. The case will therefore be remanded for further proceedings not inconsistent with this opinion. All parties shall bear their own costs.

SEITZ, Chief Judge, with whom ALDISERT and JAMES HUNTER, III, Circuit Judges, join, dissenting.

This case poses what is for the judiciary a singularly difficult and sensitive problem.

---

**39.** We note, in this connection, that the development of suitable CLAs will impose little, if any, financial burden on the State and Counties. As we indicated in Part III, the trial court made a finding, unchallenged on appeal, that per patient cost in CLAs is less than at Pennhurst. *See* 446 F.Supp. at 1312.

At a federal judicial level, we are asked to interpret relatively new and innovative legislation and to embark upon uncharted constitutional waters. At a factual level, the record presents a mass of social science and medical data from which judges are asked to fashion legal rules.

Initially, I have no trouble agreeing with the majority that the conditions at Pennhurst revealed in this record fall below a statutory or constitutional threshold of decency so as to merit judicial intervention. The district court adequately documented the deplorable conditions at Pennhurst. *See* 446 F.Supp. at 1302–11. Understaffing, filth, violence, enforced inactivity, and other horrors make Pennhurst, in the opinion of one well-traveled expert, one of the worst institutions of its kind in the world. Under these circumstances the federal courts have a right and a duty to intervene and to secure for Pennhurst's residents, at the very least, adequate living conditions. *Cf. Norris v. Frame*, 585 F.2d 1183 (3d Cir. 1978) (scrutiny of pre-trial detainee's conditions of confinement). I thus have no hesitation in agreeing that the federal judiciary should take the necessary steps to eliminate those conditions at Pennhurst.

Pennhurst as it exists today, however, must not obscure what is an entirely severable legal issue. That issue is the legality of institutionalization of the mentally retarded. The inquiry is not whether institutionalization is outmoded, undesirable, or unjustifiably expensive. Rather, the question is, assuming a Pennhurst without the deplorable living conditions here, may a federal court step in and say institutionalization is illegal, and if it can, what standard will the court employ in determining that illegality. It is on this issue that I part company with the majority.

The district court held that no matter how much one might change Pennhurst, it would never be legal to place a person in such a large institution. Although the majority rejects that theory, its position is that even if all the deplorable living conditions at Pennhurst are eliminated, it still is impermissible to place persons there if a large institution is not the least restrictive environment for that individual.

Such a rule goes far beyond the proposition that federal courts should require the state to eliminate the deplorable conditions at Pennhurst. The effect of the rule is to require the state to create new facilities regardless of the feasibility or practicality of such a course of action. Moreover, because persons develop over time, the federal courts will become embroiled in almost continual supervision to ensure that each individual at any particular moment is in the least restrictive environment.

Although I believe improvement of Pennhurst to be mandatory, I do not believe a federal court may dictate to the state the type of treatment that best suits every individual. In my view, as long as the state runs all of its facilities free of the types of conditions that exist at Pennhurst today, then the state must be given latitude to choose in which of the facilities it will place a given individual. A federal court should remove a person from an institution or forbid a particular mode of treatment only in very limited circumstances. Because I can find no basis for the rule announced by the majority in statute or Constitution, I dissent from that portion of its opinion mandating a general right to individualized treatment in the least restrictive environment.

### I. *Statutory Basis*

### A. *Developmentally Disabled Assistance and Bill of Rights Act*

I will assume that the majority is correct in asserting, first, that patients at Pennhurst have a right to treatment under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6000–6081 (the Act); and, second, that patients have an implied cause of action under the Act to enforce that right. These two conclusions, however, bring one no closer to an answer in this case, for it means little to say that a person has a "right" without defining it in a particular context. In this case, one must ask exactly what are the contours and substance of the right to treatment.

The starting point for an answer to this question is the nature and history of the implied cause of action. In England as early as the thirteenth century, the king's courts fashioned private remedies by looking to duties imposed on the defendant by royal enactments. *See generally* J. Mashaw & R. Merrill, Introduction to the American Public Law System 969–71 (1975); Katz, *The Jurisprudence of Remedies: Constitutional Legality and the Law of Torts in Bell v. Hood*, 117 U.Pa.L.Rev. 1 (1968). The essence of the implied cause of action is that the defendant breaches a duty imposed on him by a statute, and the breach in some way harms the plaintiff, who then may supplement the statutory scheme through a private suit. *See J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). One cannot divorce the implied cause of action from a duty imposed on the defendant by the statute in question. Unless the defendant's activity violated the statute, there is nothing a court can properly redress.

Applying this precept to the case at hand, the question is whether the Act imposes a duty on the defendants to provide the least restrictive treatment possible to the plaintiffs. Unless it does, the Act cannot be a proper basis for the majority's holding. I agree with the majority that the legislative history indicates a preference for least restrictive treatment, but a preference cannot be elevated into a mandatory duty without explicit statutory authority.

The Act nowhere places such a duty of least restrictive treatment on those states accepting federal funding. The Act is extremely explicit as to the duties of those states that receive such funds. The heart of the state's duty under the Act is section 6063. Before the state can receive funds, it must submit a plan to the Secretary of Health, Education, and Welfare (HEW) for approval. Prior to the 1978 amendments, section 6063(b)(20) required that the state's submission to HEW contain:

a plan designed (A) to eliminate inappropriate placement in institutions of persons with developmental disabilities, and (B) to improve the quality of care and the state of surroundings of persons for whom institutional care is appropriate.[1] Moreover, the state must maintain individual habilitation plans and an advocacy system to ensure that the general plan approved by HEW is properly implemented. *See* 42 U.S.C. §§ 6011–6012. *Cf. id.* §§ 6007, 6067 (establishing state and national planning and advisory commissions).

The requirement in section 6063(b)(20), however, in no way imposes an absolute duty on the state to provide the least restrictive treatment. For example, the regulation dealing with this portion of a state's plan provides:

The State plan shall support the establishment of community programs as alternatives to institutionalization and support such programs designed to provide services for the care and habilitation of persons with developmental disabilities, and which utilize, to the maximum extent feasible, the resources and personnel in related community programs to assure full coordination with such programs and to assure the provision of appropriate supplemental health, educational, or social services for persons with developmental disabilities.

45 C.F.R. § 1386.43 (1978). I fail to see how a duty to "support" "feasible" non-institutional care can be elevated to an absolute duty to provide the least restrictive treatment for every individual regardless of cost or available resources.

The Act elsewhere demonstrates that the state's limited resources may qualify its duty to provide alternate habilitation. For example, the state has primary control over where the funds are to be allocated. *See* 42 U.S.C. § 6003. Indeed, the House Report on the 1975 version of the Act stated:

1. This specific requirement was eliminated in 1978. The new provision still requires, however, that the plan deal with non-institutional treatment, albeit in a more general way. *See, e. g.,* 42 U.S.C.A. § 6063(b)(5)(B)–(C) (1979

Cum.Supp.). *Cf. id.* § 6063(b)(7)(B) (state plan must deal with right of employees displaced because of relocation of patients in community living arrangements).

Since the Committee is well aware that current theory with regard to the treatment and support of the developmentally disabled emphasizes that this treatment should be conducted in the individual's community without unnecessarily institutionalizing him, the Committee has chosen to include a specific requirement that state programs plan for as much deinstitutionalization as is feasible, and earmark monies for this purpose. Knowing that this may require some increase in expenditures, the Committee has also increased the authorizations of appropriations.

It is anticipated that these requirements will prompt some movement of patients from State institutions back into their communities. It is hoped that corresponding amounts of State and other funds currently being spent on institutional care will be re-budgeted for community care, an obvious rebudgeting that has not always occurred in conjunction with deinstitutionalization efforts.

House Rep.No. 94–58, 94th Cong., 1st Sess. 10, *reprinted in* 2 U.S.Code Cong. & Admin. News, 919, 928 (1975). This passage illustrates that Congress intended the Act as no more than an incentive to deinstitutionalization, not an imposition of a mandatory requirement regardless of fiscal concerns.

Thus the language and structure of the Act, the relevant regulations, and the legislative history all indicate that the states may consider their own resources in providing less restrictive treatment. The duty of the states under the Act is to provide alternative individual habilitation to the extent feasible, which includes a wide variety of fiscal concerns. Yet the import of the approach taken by the majority is exactly the opposite: it imposes a duty to provide less restrictive treatment, regardless of cost or available funds. This is an approach entirely inconsistent with the nature of an implied cause of action, which must rest on the breach of a statutory duty. In effect, the majority transforms the duty of providing *feasible* alternative treatment into an entirely different substantive obligation

that has absolutely no basis in the statutory scheme. It is improper to say an implied statutory cause of action exists and then impose new substantive duties nowhere present in the statute in question.

The majority places great emphasis on section 6010, the bill of rights section. The broad rights declared in section 6010 can be given concrete meaning, however, only by reference to the other provisions in the Act. I do not believe, especially with a funding statute such as the one here, that general findings and declarations should be used as a charter for the creation of absolute obligations where Congress felt the states should be free to choose on their own as to the proper allocation of funds. *Cf. Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977) (Title XIX gives states latitude as to whether to spend federal funds on abortion). In sum, where Congress establishes a funding scheme designed to encourage a course of conduct, that is no license to federal courts to make that conduct mandatory.

None of this is meant to denigrate the purpose of section 6010. The time has passed when retarded persons can be considered citizens without any rights whatsoever. Those rights conferred by this Act are important and a significant step on the road on which our nation has a far way to go. Yet the judiciary should not permit such feelings to exceed the obligations imposed on states by the Act. Because the Act nowhere imposes an absolute duty on funded states to provide the least restrictive treatment regardless of cost or feasibility, I would hold that the Act does not support those portions of the district court's order that create such an obligation.

B. *Rehabilitation Act of 1973*

The district court held that continued confinement at Pennhurst, which receives federal funds under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, violated section 504 of the Rehabilitation Act of 1973.[2] That provision, as amended in 1978, states in relevant part:

---

**2.** The arguments treated in this section are those of the plaintiffs, not the district court.

That court concluded that "[i]n enacting Section 504 . . . Congress has in effect codi-

> No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

29 U.S.C. § 794, as amended, Pub.L. 95–602, § 122(d)(2), 92 Stat. 2987 (1978).

The issue is whether section 504 mandates positive action by the state to create new, less restrictive habilitation facilities. On its face, the section merely says that states may not discriminate as to existing facilities; it does not require that the states take affirmative action. Thus in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court noted that section 504 did not require the state to create new facilities suitable for training nurses with hearing disabilities. After a thorough examination of the statutory structure and implementing regulations, the Court stated:

> If these regulations were to require substantial adjustments in existing programs beyond those necessary to eliminate discrimination against otherwise qualified individuals, they would do more than clarify the meaning of § 504. Instead, they would constitute an unauthorized extension of the obligations imposed by that statute.
>
> . . . Section 504 does not refer at all to affirmative action, and except as it applies to federal employers it does not provide for implementation by administrative action. A comparison of these provisions demonstrates that Congress understood accommodation of the needs of handicapped individuals may require affirmative action and knew how to pro-

vide for it in those instances where it wished to do so.

*Id.* at 2369 (footnote omitted).

The conclusion that section 504 imposes no such obligation in this case is supported by the legislative history. Most of the controversy surrounding the Rehabilitation Act concerned provisions other than section 504. As a result, legislative remarks about the purpose of that section are scarce and tend to restate the obvious. The provision's major thrust clearly is directed toward ensuring the handicapped equal access to federally-funded programs. *See, e. g.,* 118 Cong. Rec. 32,310 (Sept. 26, 1972) (remarks of Senator Humphrey); *id.* at 32,294 (Sept. 26, 1972) (remarks of Senator Cranston); Sen. Rep.No. 93–318, 93d Cong., 1st Sess., *reprinted in* 2 U.S.Code Cong. & Admin.News, pp. 2076, 2123, 2143 (1973).

Moreover, the structure and thrust of the Rehabilitation Acts of 1972 and 1973, of which section 504 was only one small part, undercuts plaintiffs' contention. The Acts essentially are funding statutes. They represent comprehensive attempts to deal with the plight of the handicapped, especially the most severely handicapped, *see* 29 U.S.C. § 701, through a system of federal grants to states for the development of the enumerated programs. *See id.* §§ 720, 721, 762. One of the clear purposes of these grants was to offer states financial incentives to deinstitutionalize the mentally retarded. *See, e. g.,* 118 Cong.Rec. 32,305 (Sept. 26, 1972) (remarks of Senator Javits); *id.* at 36,414 (Oct. 14, 1972) (remarks of Congressman Badillo).

Given the emphasis in the Rehabilitation Acts of 1972 and 1973 on encouraging the states to deinstitutionalize, I do not believe that there should be read into section 504, included in both those acts, a legislative mandate for deinstitutionalization. The carefully tailored system of programs and grants in the legislation as a whole belies

---

fied the constitutional right to equal protection." 446 F.Supp. at 1323. Because of its earlier conclusion that confinement at Pennhurst violated equal protection, *see id.* at 1321–22, the district court felt that section

504 also had been violated. The district court's analysis of the section 504 claim accordingly is subsumed in my consideration of plaintiffs' equal protection claim. *See* Part II.B. *infra.*

any congressional intention to impose an absolute duty to provide the least restrictive treatment.

Plaintiffs offer two less expansive arguments in support of the district court's holding that section 504 mandates Pennhurst's closing. First, they argue that section 504 requires the termination of a federal program designed exclusively for the handicapped if that program prevents its beneficiaries from participating in *other* federal programs. This is quite novel. No court that has granted relief under section 504 has even implied that such an interpretation is possible. *See, e. g., Leary v. Crapsey,* 566 F.2d 863 (2d Cir. 1977); *United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir. 1977); *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (7th Cir. 1977). Moreover, I believe that plaintiffs' argument cannot be justified on this record.

Plaintiffs allude throughout their briefs to a variety of federally-funded programs for the handicapped that are unavailable to Pennhurst's residents. The district court heard 32 days of testimony and argument in this case. The parties took 27 depositions. The exhibits included 108 photographs, a three-hour film, and 288 documents. An examination of this massive record does not reveal, however, a single federally-funded program from which Pennhurst residents have been excluded. Indeed, the United States, intervening on behalf of plaintiffs, concedes that the record fails to demonstrate that any programs using such funds were available to anyone in the five-county area served by Pennhurst. Thus plaintiffs' first argument is without merit.

Plaintiffs alternatively argue that Pennhurst violates section 504 by denying its residents the benefits of Pennsylvania's program of community living arrangements. This denial allegedly is based impermissibly upon the severity of the handicaps of those confined at Pennhurst.

Significantly, Pennsylvania accepts no federal funds for the operation of its community living arrangements, choosing instead to finance the program out of its own revenues. In 1976, Pennsylvania served 2069 persons in community living arrangements, 483 of whom were from the five-county region served by Pennhurst. During 1976, Pennhurst itself served approximately 1200 residents. As places have become available in community living arrangements in the five-county area, Pennsylvania has filled half of them with residents of Pennhurst and half with other retarded individuals.

Plaintiffs would have us hold that this system violates section 504 because only the most severely handicapped persons are placed at Pennhurst. Almost fifty percent of Pennhurst's residents are profoundly retarded, having I.Q.'s of less than 20. Almost three quarters are at least severely retarded, with I.Q.'s of less than 36. In addition, many of the residents are multiply handicapped. Although, given proper facilities, all of these persons could be served "in the community," no one disputes that such severely handicapped persons pose difficult placement problems. Moreover, plaintiffs do not contend that Pennsylvania has now, or has ever had, adequate facilities in the community to cope with all, most, or even many of Pennhurst's present residents. Plaintiffs' only argument is that such facilities are feasible and that Pennsylvania violates section 504 by failing to develop them.

Presumably, such an expanded program of community living arrangements could be funded by federal grants under Titles XIV and XX of the Social Security Act, 42 U.S.C. §§ 1351 *et seq.,* 1397 *et seq.* Four states, Michigan, Minnesota, Nebraska, and Oklahoma, presently finance such programs under these titles. Section 504, however, cannot be read as requiring states to accept federal funds for such a program. On the contrary, in his comments on the Rehabilitation Act of 1972, which included a provision identical to section 504 as enacted, Congressman Badillo specified that the Act would allow states "to explore the possibility of using, as much as possible, a community-based treatment approach." 118

Cong.Rec. 36,414 (Oct. 14, 1972). Plaintiffs now argue that Pennsylvania, which has chosen to use its own funds to "explore the possibility of using" community living arrangements, violates section 504 in failing to embrace that treatment approach completely and immediately. Because the legislative history reveals no more than a congressional intent to encourage deinstitutionalization, I believe that such a conclusion is untenable.

Therefore, I reject each of plaintiffs' arguments that institutionalization of the mentally retarded at Pennhurst violates section 504. Because that section supports neither the plaintiffs nor the majority, I must proceed to consider the other bases for the district court's order.

### C. *Pennsylvania Law*

The majority holds that Pennsylvania's Mental Health and Mental Retardation Act of 1966 (MH&MRA), 50 P.S. § 4101 *et seq.,* grants the retarded a statutory right to treatment and that the plaintiffs have a private cause of action under the statute to enforce that right. The majority seems to implicitly rest its least restrictive treatment rule in part on Pennsylvania law.

I will assume that the residents of Pennhurst have a statutory right to some kind of treatment under the 1966 legislation. I cannot say as a matter of Pennsylvania law, however, that whatever treatment the residents are entitled to receive must be provided in the least restrictive environment possible. The question is: If the deplorable conditions evidenced in the record were eliminated at Pennhurst, would some individual still have an absolute right as a matter of state law to be placed in a less restrictive setting?

Initially, as with any implied cause of action, the remedy must be tied to violation of an express statutory provision. General language may not obscure the need for concrete imposition of a specific duty. Article II of the MH&MRA sets out the duties of the state and nowhere does it mention a duty to provide the least restrictive treatment regardless of fiscal concerns.

Moreover, the structure of the MH&MRA itself implies that Pennsylvania's General Assembly, in enacting the legislation, contemplated no such absolute right to treatment outside a properly run institution if such were the least restrictive environment imaginable. A major purpose of the MH&MRA was to ensure proper division of responsibilities between the state's Department of Public Welfare (DPW) and local authorities, primarily cities and counties. *See* 50 P.S. §§ 4102, 4202(a), 4301(d), 4507(a)(1). This division of authority indicates that DPW was to operate regional facilities like Pennhurst while the localities were to concentrate on community-based services such as after-care. The very fact that both exist side by side in the legislative scheme without any language about placement in one or the other belies any theory that the General Assembly intended an absolute right to one to the exclusion of the other.

Buttressing my conclusion that the MH&MRA contemplated institutionalization of the mentally retarded are statistics, cited by the district court, indicating that institutionalization as a means of providing for the retarded was on the rise through 1966, the year of the MH&MRA's enactment. *See* 446 F.Supp. at 1300 n.7. The record shows that only in 1970 did Pennsylvania begin to explore the possibility of deinstitutionalizing Pennhurst's residents. *See* 446 *id.* at 1312. I believe it would be anomalous to attribute to the General Assembly of 1966 an intention to require treatment of the mentally retarded in a community setting because it would be less restrictive than an institution when the state did not even consider community treatment until 1970.

Nor do I believe that intervening changes in attitudes toward habilitation of the mentally retarded allow this court to reject the legislative judgment, implicit in the MH&MRA, that institutions, if properly run, can provide the mentally retarded with the requisite services. The General Assembly has not indicated that it has reached a contrary conclusion. Furthermore, the only Pennsylvania courts to consider analogous issues seem to have assumed that institu-

tionalization is permissible without examining it as the least restrictive alternative under the MH&MRA. For example, in *Hoolick v. Retreat State Hospital*, 24 Pa. Cmwlth. 218, 354 A.2d 609 (1976), *aff'd mem.*, 476 Pa. 317, 382 A.2d 739 (1978), the Commonwealth Court rejected a claim that the MH&MRA required DPW to continue to operate the Retreat State Hospital. In so ruling, the court noted that the hospital was "an institution within the framework of mental health facilities operated by the Commonwealth." *Id.* at 220, 354 A.2d at 610. According to the Commonwealth Court:

> The manifest object of the General Assembly in enacting the Mental Health and Mental Retardation Act of 1966 was to create a cooperative State-county (or multi-county) program across the Commonwealth for those who suffer mental health or mental retardation afflictions. . . . To retard or restrict State action in the operation of such a program, a clear specific legislative intent that a particular mental health facility shall remain functional would be required.

*Id.* at 224, 354 A.2d at 612. Thus under *Hoolick*, the legislature gave the DPW wide latitude in choosing what type of an institution best suits an individual.

Moreover, the state's duty to treat individuals is subject to the financial limitations of its own treasury. *Cf. County of Allegheny v. Commonwealth*, 33 Pa. 267, 381 A.2d 1014 (1978) (state's liability to county not absolute). Indeed, in one case, the county placed an individual in a private home; because this was not authorized by the Act, the state was not liable to the county for the expenditure. *In the interest of Wayne K.*, 34 Pa. 10, 382 A.2d 989 (1978). At the least, then, the state right to treatment does not include a right to placement in a private home, even if that is the least restrictive environment.

Absent legislative action indicating that a particular type of facility, acceptable to the General Assembly in 1966, no longer passes legislative muster, I cannot predict that a Pennsylvania court facing this same question would hold that an individual has an absolute right to treatment in another less restrictive institution. I would hold only that, according to Pennsylvania law, any right the mentally retarded may have under the MH&MRA to habilitation can be satisfied in an institutional setting properly maintained.

## II. *Constitutional Basis*

### A. *Due Process*

The final question presented by the plaintiffs is the constitutionality of the state statutory scheme of institutionalizing people in Pennhurst. The district court held that retarded persons, once admitted to a state facility, "have a constitutional right [under the due process clause] to be provided with minimally adequate habilitation under the least restrictive conditions consistent with the purpose of the commitment." 446 F.Supp. at 1319. Having found such a right, the district court further held that Pennhurst, because it is an institution, could never provide minimally adequate habilitation and that Pennhurst's residents were entitled to be placed in community living arrangements. *Id.* at 1318, 1320.

The majority holds that some individuals may remain in Pennhurst, thus rejecting the district court's thesis. It purports to do this on statutory grounds, thereby avoiding the constitutional issue. The majority's apparent justification for failing to reach the constitutional issue is that the legislation involved here does not require less than is mandated by the Constitution. The majority merely makes this statement without explaining why its unarticulated view of the Constitution is correct and the district court's theory is incorrect. If, as I believe, the statutes in question provide no cause of action to enforce a generalized absolute right to least restrictive treatment, then the only remaining basis for the majority's holding is the Constitution.

My approach presents two questions. First, decide what are the permissible governmental purposes that support civil commitment of the mentally retarded. Second, determine whether those purposes are suffi-

cient to support institutionalization or whether the state has a constitutional duty to employ means less restrictive of individual freedom.

In finding a constitutional right to habilitation, the district court relied on a series of cases that grant non-dangerous mental patients who are involuntarily committed a right to psychiatric treatment. The seminal right-to-treatment case was *Rouse v. Cameron*, 125 U.S.App.D.C. 366, 373 F.2d 451 (D.C.Cir.1966), which dealt with a statutory right to treatment. In dictum, the court indicated that the failure to treat a mental patient who had been committed by the state was sufficiently "shocking" to violate due process guarantees. *See id.* at 370, 373 F.2d at 455.

A number of courts have expanded upon *Rouse*'s dictum. The Court of Appeals for the Fifth Circuit offered the strongest defense of the right to treatment in *Donaldson v. O'Connor*, 493 F.2d 507 (5th Cir. 1974), *vacated on other grounds and remanded*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974), *aff'g, Wyatt v. Stickney*, 325 F.Supp. 781 (M.D.Ala.1971) (*Stickney I*). *Donaldson* noted that involuntary confinement must be justified by a legitimate state purpose to survive scrutiny under the due process clause. *See Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). Historically, civil commitment had been based on one of three grounds: danger to self, danger to others, or need for treatment. *See id.* at 737, 92 S.Ct. 1845. Because uncontradicted evidence demonstrated that Donaldson was dangerous neither to himself nor to others, the only legitimate basis for his confinement was the provision of treatment. According to the Fifth Circuit, the state of

Florida, which confined Donaldson to treat him, had a constitutional duty to provide him with adequate and effective treatment, the "quid pro quo" for his confinement. *See* 493 F.2d at 518–27.[3]

The first case to apply the right-to-treatment rationale to the mentally retarded was *Wyatt v. Stickney*, 344 F.Supp. 387 (M.D.Ala.1972) (*Stickney II*), *affirmed in relevant part sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974). Having determined in *Stickney I* that persons involuntarily committed to mental institutions had a right to treatment, the district court felt compelled to extend an analogous right to the mentally retarded. *See* 344 F.Supp. at 390.[4]

I can assume, without deciding, that a nondangerous individual committed by the state because of an alleged mental illness has a right to receive psychiatric treatment for his or her condition. I do not agree, however, with the assertion made in *Stickney II* that, in this regard, "no viable distinction can be made between the mentally ill and the mentally retarded." 344 F.Supp. at 390. On the contrary, as the Supreme Court has noted in another context, "careful attention must be paid to the differences between [the] mentally ill and [the] mentally retarded." *Kremens v. Bartley*, 431 U.S. 119, 135–36, 97 S.Ct. 1709, 1718, 52 L.Ed.2d 184 (1977). In particular, I believe that the government's purpose in depriving Pennhurst's residents of their liberty is quite different from the government's purpose in depriving a non-dangerous, mentally ill person of his or her liberty.

As noted earlier, the Supreme Court has identified three conditions that might justify civil commitment: danger to self, danger

---

**3.** The Supreme Court in *Donaldson* stopped short of endorsing the quid-pro-quo approach. *See O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). Our court has specifically reserved ruling on the theory. *See Scott v. Plante*, 532 F.2d 939, 947 (3d Cir. 1976).

**4.** Since 1972, a number of courts have followed *Stickney II* and have held that mentally retarded persons confined in state-run institutions

have a constitutional right to habilitation. *See, e. g., Welsch v. Likins*, 373 F.Supp. 487 (D.Minn.1974), *aff'd in part and vacated and remanded in part*, 550 F.2d 1122 (8th Cir. 1977). In each of these cases, however, the court concluded or assumed that the state could provide the necessary habilitation in an institutional setting. *See, e. g., Gary W. v. Louisiana*, 437 F.Supp. 1209, 1217–19 (E.D.La.1976).

to others, and need for treatment. *See Jackson v. Indiana,* 406 U.S. 715, 737, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). In *O'Connor v. Donaldson,* 422 U.S. 563, 574 n.9, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975), the Supreme Court briefly examined the "danger to self" rationale and indicated that it considered inability to care for oneself a permissible basis for civil commitment:

> Of course, even if there is no foreseeable risk of self-injury or suicide, a person is literally "dangerous to himself" if for physical or other reasons he is helpless to avoid the hazards of freedom either through his own efforts or with the aid of willing family members or friends.

No one disputes that most, if not all, of Pennhurst's residents are dangerous to themselves in this sense. Severely or profoundly retarded, often with multiple handicaps, the residents obviously are unable to fend for themselves. Nor, as the district court's findings on voluntariness make clear, are there "willing family members or friends" available to shield them from the "hazards of freedom."

I believe that the residents' inability to live independently distinguishes this case from *Donaldson* and other cases granting non-dangerous mental patients a right to treatment. Moreover, I believe that the state's willingness to provide the residents with such necessities as food, shelter, medical care, and supervision, for which the residents have no other source, forms an adequate basis for some state-imposed restrictions on their liberty.

I am left, of course, with the question whether the residents' need for care and supervision justifies the magnitude of the restraint imposed by institutionalization. The Court of Appeals for the Fifth Circuit has argued that it does not. In *Wyatt v. Aderholt,* 503 F.2d 1305, 1313 (5th Cir. 1974) (affirming *Stickney I* and *Stickney II* ), the court emphasized that commitment entailed " 'massive curtailments' of individual liberty." The court continued:

> Against the sweeping personal interests involved, [the state of Alabama] would have us weigh the state's interest, and the interests of the friends and families of the mentally handicapped in having private parties relieved of the "burden" of caring for the mentally ill. The state interest thus asserted may be, strictly speaking, a "rational" state interest. But we find it so trivial beside the major personal interests against which it is to be weighed that we cannot possibly accept it as a justification for the deprivations of liberty involved.

Several factors persuade me to reject *Wyatt's* reasoning in the context of this case. First, that decision preceded the Supreme Court's decision in *Donaldson.* As noted, the Supreme Court there indicated that the need to provide mentally handicapped persons with custodial care could, under some circumstances, support civil commitment. Moreover, to the extent that *Wyatt's* reasoning survived *Donaldson,* the realities of Pennhurst as recorded in the findings of the district court preclude its application in this case. The vast majority, almost 90 per cent, of Pennhurst's residents are 18 years of age or older. Under Pennsylvania law the duty of parents or relatives to contribute to the support of an unmarried person who has been committed or who is receiving services under the MH&MRA terminates upon that person's attainment of 18 years of age. *See* 50 P.S. § 4502. Moreover, relatives and friends who will accept responsibility for the care of Pennhurst's residents either do not exist or are unwilling or unable to do so. The district court found that 43 per cent of the residents have had no family contact in the past three years. The record does not show what percentage of the residents have family members still living. *See* 446 F.Supp. at 1302 & n.16. Even as to those residents under the age of 18, the district court found that Pennhurst "was and is their only alternative," *id.* at 1311 (footnote omitted), and that "they have no place else to go," *id.* at 1318. Given these findings, defendants are doing far more than relieving otherwise willing and able relatives of the burden of caring for the residents; they are acting as the residents' only source of food, shelter,

supervision, and medical care. Far from being "trivial," these services are a matter of life or death to the residents. *See generally New York State Association for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752, 759–60 (E.D.N.Y.1973), *consent judgment approved*, 393 F.Supp. 715 (E.D. N.Y.1975), *aff'd*, 596 F.2d 27 (2d Cir.), *cert. denied*, —— U.S. ——, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979). *But see Gary W. v. Louisiana*, 437 F.Supp. 1209, 1217 (E.D.La. 1976) (all members of plaintiff class were minor children).

Having concluded that the residents' need for care and supervision can support significant restrictions on their personal liberty, it nevertheless must be decided whether Pennsylvania must provide for the residents' needs in a manner least restrictive of those liberties, or whether it is sufficient that the restrictions be rationally related to the purpose of confinement. The district court here felt that *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), required use of less drastic means in general, and community living arrangements in particular. In *Shelton* the Supreme Court considered an Arkansas statute requiring every teacher to file an annual affidavit listing all organizations to which he or she belonged or contributed. In striking down the requirement as an unconstitutional abridgment of first amendment freedoms, the Court held that

> even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose.

*Id.* at 488, 81 S.Ct. at 252 (footnotes omitted).

It is quite possible that the Supreme Court has already rejected the contention that *Shelton*'s less-drastic-means analysis applies to the conditions of civil commitment. *See State v. Sanchez*, 80 N.M. 438, 457 P.2d 370 (1968) (mentally ill), *dismissed for want of a substantial federal question*, 396 U.S. 276, 90 S.Ct. 588, 24 L.Ed.2d 469 (1970). *See generally Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (per curiam); *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *Halderman v. Pennhurst State School & Hospital*, 446 F.Supp. at 1319 n.55; *Patton v. Dumpson*, 425 F.Supp. 621, 624 (S.D.N.Y.1977). Nevertheless, I believe that the importance of this issue merits a full examination of plaintiffs' argument.

In two cases dealing directly with the conditions and duration of civil confinement the Supreme Court has not been required to reach the question whether a state must provide its mental health services in a manner least restrictive of fundamental liberties. In *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the Court examined the constitutionality of a statutory scheme that permitted indefinite, and probably permanent, commitment of a person adjudged incompetent to stand trial on criminal charges. In holding that this procedure deprived the petitioner of due process of law, the Court reasoned that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.* at 738, 92 S.Ct. at 1858. Similarly, in *O'Connor v. Donaldson, supra*, 422 U.S. at 576, 95 S.Ct. at 2494, the Court explored the minimum protection afforded by due process, holding that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom." In both *Jackson* and *Donaldson* the challenged restrictions were invalidated under this minimal scrutiny. But by employing the phrases "at the least" and "without more," the Supreme Court left open the possibility that it might apply stricter scrutiny in a proper case.

Recently, in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court considered the constitutional requirements for the conditions under which pre-trial detainees may be confined. The plaintiff detainees, who were

confined solely because of their inability to post bail, complained, *inter alia*, that the practice of assigning two detainees to a cell designed for one person denied them due process of law. In upholding the constitutionality of "double-bunking," the Supreme Court declined to apply the "compelling necessity" test that had been adopted by the Court of Appeals for the Second Circuit. Instead, the majority focused on whether double-bunking constituted infliction of punishment, and phrased the standard of review as whether "a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective." *Id.* at 1874.

*Bell*, although dealing with the conditions of confinement of pre-trial detainees is not dispositive of the standard of review to be applied in this case.. The plaintiffs in *Bell* did not contend that double-bunking, as opposed to single-bunking, was unduly restrictive of any express constitutional guarantee. *See id.* at 1871. In this case, however, plaintiffs argue that institutions, when compared with community living arrangements, are more restrictive of such fundamental rights as freedom to travel and freedom of association. Assuming this to be the case, I will consider the applicability of some sort of less-drastic-means analysis.

The Supreme Court first formalized less-drastic-means analysis in *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Prior to that decision, the consideration of less restrictive alternatives was at least implicit in a number of opinions. *See The Supreme Court, 1960 Term*, 75 Harv.L.Rev. 40, 129 (1961) (collecting cases). Those earlier decisions, however, tended to treat less drastic alternatives as only one consideration in the overall assessment of an enactment's reasonableness. *Compare Shelton v. Tucker, supra,* at 488–90, 81 S.Ct. 247, *with id.* at 493–94, 81 S.Ct. 247 (Frankfurter, J., dissenting). In *Shelton* the Court seemed to hold that the existence of less drastic means would almost always invalidate a statute that impinged upon "fundamental personal liberties." *See id.* at 488, 81 S.Ct. 247.

Since 1960, application of ˙less-drastic-means analysis has been far from uniform. *See, e. g., United States v. Robel*, 389 U.S. 258, 267, 88 S.Ct. 419, 425, 19 L.Ed.2d 508 (1967) ("It is not our function . . . to determine whether an industrial security screening program exhausts the possible alternatives to the statute under review."); L. Tribe, American Constitutional Law 722–23 (1978); Note, *Less Drastic Means and the First Amendment*, 78 Yale L.J. 464, 464–65 (1969). Moreover, even in the prototypical situation, where an allegedly overbroad statute impinges upon first amendment guarantees, the Supreme Court has been extremely cautious in employing the analysis. *See* Note, *supra,* at 472. Carried to its logical extreme less-drastic-means analysis is, as Justice Blackmun has noted, a "slippery slope":

> A judge would be unimaginative indeed if he could not come up with something a little less "drastic" or a little less "restrictive" in almost any situation, and thereby enable himself to vote to strike legislation down.

*Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 993, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring).

I engage in this overview not to suggest abandonment of less-drastic-means analysis, but to emphasize the care with which it must be employed. In the proper context this mode of analysis is a useful instrument for detecting unconstitutional overbreadth. I believe, however, that the present case falls outside that context.

Implicit in rigid application of less-drastic-means analysis is a presumption that, absent countervailing governmental interests, an individual benefits from unfettered freedom. In some circumstances, of course, societal interests prevail and mandate restriction of that freedom. Nevertheless, the search for less drastic means is a judicial attempt to ensure that the intrusion is as small as possible.

This model falters where the individual, in the Supreme Court's words, is "helpless to avoid the hazards of freedom." *O'Con-*

*nor v. Donaldson, supra,* 422 U.S. at 574 n.9, 95 S.Ct. at 2493. In such a case, the very purpose of the governmental intrusion is to prevent the individual from exercising his or her freedom in a self-destructive manner. Analytically, the difficulty is not an absence of less drastic means; in theory there will be some perfect balance between freedom and supervision, some "least restrictive alternative." Instead, the difficulty I perceive is a judicial inability to strike the perfect balance in any particular case. In an influential article cited with approval in *Shelton,* Elliot Richardson pinpointed the advantage of less-drastic-means analysis over the traditional balancing of interests employed by courts in first amendment cases:

> With the question whether the restriction of expression is a necessary means of protecting some other interest, we come back to judgments of a more objective character. The efficacy of the restriction of speech as such a means . . . [is] a matter as to which it could more easily be said than in the case of the value of a threatened interest that a legislative judgment was or was not plainly wrong. The same is true of the question whether other means are available.

Richardson, *Freedom of Expression and the Function of Courts,* 65 Harv.L.Rev. 1, 40 (1951). *See* 364 U.S. at 488 n.9, 81 S.Ct. 247. It is this objectivity, this ability to identify a single, better alternative, that commends less-drastic-means analysis.

This objectivity, however, counsels against use of the doctrine in the manner utilized by the district court. Here, there is not one ideal balance between freedom and supervision, but 1200, one for each of Pennhurst's residents. Some residents are capable of surviving with only minimal supervision. Others require complete, if temporary, physical restraint. *See* 446 F.Supp. at 1328. This complexity precludes a single, objective solution, making use of less-drastic-means analysis to declare institutions per se unconstitutional particularly inappropriate.

The problem is not solved by arguing that less-drastic-means analysis requires individualized determinations rather than condemnation of institutions as a class. In the first place, what is the least restrictive environment for any particular individual is primarily a medical question. As the record demonstrates, this concept is an uncertain one and has been the subject of fervent medical debate. I feel it inappropriate for courts to make such a judgment on the basis of a doctrine that contemplates an objective, single better alternative. Second, the least restrictive alternative for any particular individual will change over time. Thus there is no single and final solution—the heart of the less-drastic-means analysis—for each individual. By imposing upon a state a constitutional duty to provide its custodial care in the least restrictive manner, almost every decision concerning the care of a mentally retarded person would be subjected to ongoing judicial review.

Plaintiffs cannot salvage their proposed analysis by labelling community living arrangements as *the* least restrictive alternative. The definitional elasticity of the term "community living arrangement" [5] renders such an argument quite circular. Whether

---

5. Indeed, the record indicates that community living arrangements tend to be all things to all people. They apparently range from simple provision of support services so that a retarded person can remain with his or her family to subsidized foster care to mini-institutions of over 20 residents. The "community" is variously defined as urban, suburban, or rural. Stewart Brown, one of the plaintiffs' witnesses, illustrated the malleability of this concept when he was pressed on his contention that all of Pennhurst's residents could be dispersed to community living arrangements within one month:

A: . . . There are seventy-one Holiday Inns in Pennsylvania with 11,208 rooms, and we could, with a *per diem* rate move those clients and provide an immediate place for them to live where they would be happy—

Q: All right. Let's talk about community-living arrangements.

A: That's one type of community-living arrangement.

this setting is called a community living arrangement or something else, the federal courts would still be required to balance each resident's need for supervision and care against that resident's ability to cope with personal liberty. Such decisions traditionally, and I believe properly, have been left in the hands of physicians and mental health administrators.

Drawing from *Jackson, Donaldson,* and *Bell,* I would hold that where the state confines [6] a person against his or her will because of an inability of that person "to avoid the hazards of freedom," the conditions of that confinement must bear a reasonable relationship to the purpose of the confinement. I do not believe that a state can be constitutionally required to care for that person in a manner "least restrictive" of that person's freedom. Nevertheless, the availability of less drastic alternatives is one factor for a court to consider in determining the overall reasonableness of the challenged restraint. *See, e. g., Bell v. Wolfish, supra,* 99 S.Ct. at 1885 n.40.

In applying this standard of review to the case at bar, I again must stress that what is at issue here is not whether it is constitutional to place persons in Pennhurst as it existed when this record was created. There can be no question that Pennhurst is not providing its residents with minimally adequate supervision and care. Instead, the question is the constitutionality of institutions as they should be operated.

Moreover, my rejection of less-drastic-means analysis does not mean that I conceive of a "properly run institution" as a monolithic concept unrelated to the needs of particular individuals. What may be the appropriate treatment very likely will vary

from person to person within the institution. The test I choose—a right to treatment rationally related to the purpose of the state-imposed restraints on liberty—applies to every individual, whether inside or outside an institution. Thus in my view, the phrase "properly run institution" means properly run as to all those confined in it. Given the current medical definition of retardation and the fact that I do not know what a properly run Pennhurst would be like, I leave for future cases the question of whether a particular individual placed in an institution free of the deplorable conditions in the record here would ever have a constitutional right to treatment in a different environment.

With these caveats in mind, I conclude that institutionalization is not a constitutionally unreasonable means of providing for the care and supervision of the mentally retarded. A large-scale institution is quite capable of providing its residents with adequate food, shelter, medical care, and other necessities. Moreover, given the residents' need for such services, an institution does not necessarily restrict their liberty in an unreasonable fashion. I am not dissuaded from this conclusion by the feasibility of less restrictive, more effective, or even less expensive methods of caring for the retarded.[7]

The choice among models for the care of the retarded properly rests with state authorities. Federal courts may not interfere with that choice unless the selected model is not a reasonable means of delivering the services that support civil commitment in the first place. I leave for future cases the determination of whether a given method of treatment is not rationally related to the

---

**6.** Plaintiffs have not challenged in this appeal the adequacy of the procedures under which they were committed or placed at Pennhurst. *See generally Secretary of Public Welfare of Pennsylvania v. Institutionalized Juveniles,* —— U.S. ——, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979).

**7.** Supporting my conclusion that institutionalization is not unconstitutionally unreasonable are those cases that, although finding a consti-

tutional right to habilitation, have permitted the state to continue to provide that habilitation in an institutional setting. *See, e. g., Gary W. v. Louisiana, supra,* 437 F.Supp. at 1217–19; *Wyatt v. Stickney (Stickney II), supra,* 344 F.Supp. at 395–407. *See also Wyatt v. Aderholt, supra,* 503 F.2d at 1313 (institutionalization is, "strictly speaking," rationally related to need for custodial care).

state's objective in confining a particular individual.

### B. *Equal Protection*

The district court also held that confinement at Pennhurst violated the equal protection clause of the fourteenth amendment because it entailed "segregation in a facility that clearly is separate and *not* equal." 446 F.Supp. at 1322 (emphasis in original). As in the case of their due process claim, plaintiffs' equal protection claim turns primarily on the proper level of judicial scrutiny to be applied to institutionalization of the mentally retarded.

Initially, I reject plaintiffs' contention that mental retardation qualifies as a "suspect classification." In *Doe v. Colautti*, 592 F.2d 704, 710–11 (3d Cir. 1979), we held that mental illness was not a suspect classification. We noted that, under *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam), "a class is not entitled to special solicitude under the Equal Protection Clause unless the members of the class have 'been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities.'" 592 F.2d at 711. Applying this rule to the mentally ill, we noted:

> Although the mentally ill have been the victims of stereotypes, the disabilities imposed on them have often reflected that many of the mentally ill do have reduced ability for personal relations, for economic activity, and for political choice. This is not to say that the legal disabilities have precisely fit the actual incapacities of the mentally ill individuals whom the law has burdened, but it is important that the legal disabilities have been related, even if imperfectly, to real inabilities from which many of the mentally ill suffer.

*Id.* I believe that this reasoning is equally applicable to the mentally retarded.

Alternatively, plaintiffs argue that where a classification burdens fundamental liberties, the state must show that the burden is necessary to achieve a "compelling" government interest. *See Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The state's interest in ensuring that these individuals receive adequate food, shelter, supervision, and medical care is compelling enough to justify the intrusion. Although *Shapiro* and other equal protection cases may imply that the state must employ less drastic means if they are available, *see, e. g.*, 394 U.S. at 637, 89 S.Ct. 1322, I believe this analysis is inapposite for the reasons given in my discussion of the due process claim.

For these reasons I believe that, although Pennsylvania has classified the residents by institutionalizing them, such a classification is reasonably related to a legitimate, compelling state interest.

### C. *Eighth Amendment*

The district court finally found that Pennhurst violated the residents' "Eighth and Fourteenth Amendment right to freedom from harm." 446 F.Supp. at 1320. To the extent that this alleged right would parallel the right to be free from punishment, recognized in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), I have already expressed my view that institutionalization of the mentally retarded is "reasonably related to a legitimate governmental objective." *See id.* at 539, 99 S.Ct. at 1874. To the extent that the alleged right to be free from harm, founded in the eighth amendment, would exceed the protection outlined in *Bell*, I do not believe the district court's analysis survives that decision.

### III. *Summary*

I agree with the majority that plaintiffs have a right to have Pennhurst brought up to statutory and constitutional standards. I nowhere find a right to treatment in the least restrictive environment. Thus I would reverse those portions of the district court's judgment that contemplate a federal-court-ordered closing of Pennhurst or

creation of new, less restrictive facilities. Although some portions of the order dealt with conditions at Pennhurst, because the district court ordered it closed it did not deal extensively with that problem. Therefore, I would remand to the district court for it to decide in the first instance how best to bring Pennhurst in compliance with statutory and constitutional requirements. Finally, I leave open the possibility that certain individuals in the future may be able to show that their particular mode of treatment is not rationally related to the state's purpose in confining them.

The majority's definition of habilitation has real emotional appeal. But its implementation is being provided by doctors, experts, and legislators. There is a danger in a case such as this that a court will permit the technical data to provide the sole basis for a legal rule where the problem is essentially medical.

Furthermore, the majority's conclusion implicates massive and continual involvement of the federal judiciary in the multiple problems of the mentally retarded. I disagree with the majority because I cannot find any basis for holding that a federal court may require the state to create facilities for the retarded that the court deems to be the least restrictive. That is a right that, in my view, neither Pennsylvania nor federal legislation nor the Constitution gives to the plaintiffs.

